434 So.2d 982 (1983)
R.D. WELLES, E.C. Welles, Jr., Barbara Welles Probasco, Terrence Lee Welles and W.G. Welles, IV, Appellants,
v.
Jack M. BERRY and Ruth Berry, His Wife, John R. Paul and Margaret W. Paul, His Wife, Bryan West Paul, J. Walter Tucker, Jr., John R. Paul, Jr., and Julia M. Paul, His Wife, Carroll E. Jones and Sheron L. Jones, His Wife, Bob Paul, Inc., Berry Groves, Inc., Congen Properties, Inc., Connecticut General Life Insurance Company, and Jack M. Berry Grove Corporation, Appellees.
No. 82-1991.
District Court of Appeal of Florida, Second District.
July 1, 1983.
*983 Claude H. Tison, Jr., of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellants.
Marie Evans Henkel of Anderson & Rush, Orlando, for appellees.
GRIMES, Judge.
This appeal points up some of the complexities involved in the creation of interests in oil and gas.
In their amended complaint appellants allege that on October 29, 1963, they entered into an agreement to purchase from appellees or their predecessors in title[1] a one-half share of the income or sales proceeds received from the leasing, sale, or other disposition of any oil, gas, or other minerals produced from 16,000 acres of specifically described land in Hendry County. The recorded agreement, which recited that the sellers owned fee simple title to the land, provided in pertinent part:
NOW, THEREFORE, the said Sellers, in consideration of the sum of $10.00 and other good and valuable considerations to them in hand paid by the said Buyers, the receipt whereof is hereby acknowledged, have and do hereby grant, bargain, sell, convey, transfer and set over unto the said Buyers, their personal representatives, heirs and assigns forever, one-half of all income and one-half of all sales proceeds from any sources received from the leasing, sale or other disposition of any oil, gas, casinghead gas, shell, rock, sand, and all other minerals and metals saved and produced from the aforesaid described premises and each and every part thereof, for a period of twenty-five years from the date hereof and so long thereafter as any income or sale proceeds from the same are being received by the *984 then owners of said property or any part thereof.
TO HAVE AND TO HOLD said rights hereby conveyed absolutely and forever, for and during the period aforesaid provided.
Notwithstanding the execution hereof, the said Sellers, their personal representatives, heirs or assigns, hereby reserve the right to enter into all agreements concerning the leasing, sale or other disposition of said products, without the joinder therein of the Buyers or any of them, and to settle and unilaterally determine the prices, terms and conditions of payment therefor; provided, however, upon receipt of payment of any rents, royalties or proceeds from the sale of any and all of said products, one-half thereof shall forthwith be remitted to the Buyers in proportion to their ownership, consisting of one-fourth of said one-half to each of said Buyers, their personal representatives, heirs or assigns.
It is further understood and agreed that this is a covenant running with the land and that any future sales of said above described premises or any part thereof shall be specifically subject to the terms and conditions hereof.
The appellants further allege that in 1965 the parties then owning the land entered into an oil lease in which they received $2,045 in rentals and pursuant to the agreement paid appellants one half of this amount. The landowners entered into a second oil lease in 1971 from which they obtained approximately $81,000 but failed to remit any monies to the appellants. Appellants then sued and obtained judgment for a one-half share of the income. Appellants allege that thereafter appellees have steadfastly refused to enter into any further leases for the exploration and exploitation of oil or other minerals on the land despite the fact that prospective lessees have offered leases on favorable terms. They assert that appellees have expressed their intent to continue to refuse to enter into any further leases until after October 29, 1988, the nominal expiration date of the agreement, for the purpose of defeating and extinguishing the appellants' right to income resulting from oil leases on the property. Appellants contend that the acts and omissions of the appellees were done in bad faith for the purpose of destroying appellants' rights under the agreement. They seek a mandatory injunction to require appellees to execute appropriate oil leases, damages for income lost in prior years, and other relief. The court granted appellees' motion to dismiss and entered an order dismissing the amended complaint with prejudice.
Our study of oil and gas law leads us to believe that by the execution of this agreement, the appellants obtained a nonparticipating royalty interest in the oil, gas, and other minerals produced from the specified lands.[2] Jones, Exercise of Executive Rights In Connection With Non-Participating Royalty and Non-Executive Mineral Interests, 15 Inst. on Oil & Gas L. & Tax'n 35 (1964). A nonparticipating royalty is defined as an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under oil, gas, or mineral leases executed by the owner of the mineral fee estate. Stokes v. Tutvet, 134 Mont. 250, 328 P.2d 1096 (1958); Picard v. Richards, 366 P.2d 119 (Wyo. 1961). The exclusive leasing privilege which remains in the mineral fee owner is commonly referred to as the executive right. Nonparticipating royalty interests may be created by a grant or reservation, either prior or subsequent to a lease of the land for oil and gas purposes. Jones, *985 Non-Participating Royalty, 26 Tex.L.Rev. 569 (1948).
The appellees point out that there is nothing in the agreement which specifically obligates them to enter into oil and gas leases on the property. The appellants argue that the nature of the agreement is such that there is an implied covenant requiring the holder of the executive right to exploit the land for oil and gas. Appellants refer to oil lease disputes in which the courts have consistently held that despite the absence of explicit language, the lease carries with it an implied covenant on the part of the lessee to reasonably develop the land for oil and gas. 5 H. Williams and C. Meyers, Oil and Gas Law § 832 (1982). This court construed a rock lease to contain just such an implied covenant in Deerfield Rock Corp. v. McClellan, 121 So.2d 822 (Fla. 2d DCA 1960), cert. dismissed, 127 So.2d 892 (Fla. 1961). Of course, the instant case involves a conveyance. Thus, the parties here are not in the same posture as a landowner who enters into an oil lease with a drilling company, and it has been said that there is a much stronger reason for favoring an implied covenant to develop under a lease than there is in a conveyance. Danciger Oil & Refining Co. v. Powell, 137 Tex. 484, 154 S.W.2d 632 (1941). Nevertheless, in a number of nonleasing situations, a duty of reasonable development has been imposed upon the party having control over the mineral exploitation of land. See 2 H. Williams and C. Meyers, Oil and Gas Law § 339.2 (1981); Merrill, Implied Covenants Between Others Than Lessors and Lessees, 27 Wash. U.L.Q. 155 (1942).
1 E. Kuntz, The Law of Oil and Gas § 15.7, at 351 (1962) (footnotes omitted) states:
It is obvious that certain duties should be imposed upon the holder of the exclusive leasing power in the exercise of such power. In many instances, the self-interest of the holder of the power will be inimical to the interests of the owners of interests subject to the power. In instances where the power is a naked one, the holder of the power must consider and serve various conflicting interests in the exercise of such power. In all jurisdictions with expressions on the subject, with the possible exception of Louisiana, it has been held or assumed that the holder of the exclusive leasing power owes a duty to the owners of interests subject to such power.
A major reason for placing a duty upon the holder of the executive right is the disparity between the positions of the parties. The owner of the nonparticipating royalty interest cannot demand partition of the mineral fee estate and has no right to execute any leases. Terminable or defeasible nonparticipating royalty interests are especially vulnerable to deliberate dilatory tactics of the executive to postpone actual production until after the terminal date of the interest. Jones, Exercise of Executive Rights In Connection With Non-Participating Royalty and Non-Executive Mineral Interests, 15 Inst. on Oil & Gas L. & Tax'n 35, 78-80 (1964). In their brief, appellees seek to undercut the impact of this rationale by suggesting that the agreement gives the appellants a perpetual royalty interest. Thus, they argue that no purpose would be served by appellees in deliberately delaying the leasing of the oil because appellants will always be able to share in the income from subsequent leases. This may be a dubious distinction because similar habendum language known as the "thereafter" clause contained in oil leases has been consistently construed as limiting the lease to the primary term and if oil is then being produced, for as long thereafter as oil continues to be produced. 3 H. Williams and C. Meyers, Oil and Gas Law §§ 603.3, 604 (1981). Some courts have applied the same construction to instruments creating nonparticipating mineral or royalty interests on the premise that when the parties used unique language which has acquired a definite meaning when applied to oil and gas leases, it is reasonable to assume that they intended to adopt the same meaning. Midwest Oil Corp. v. Winsauer, 159 Tex. 560, 323 S.W.2d 944 (1959); Wilson v. Holm, 164 Kan. 229, 188 P.2d 899 (1948); but see Beatty v. Baxter, 208 Okla. 686, 258 P.2d 626 (1953).
*986 Even where a covenant is implied, neither the courts nor the commentators are in full agreement on the standard of conduct which should be required of the holder of the executive right. Smith, Oil and Gas, 30 Sw.L.J. 107, 109 (1976). The better-reasoned authorities seem to have settled on a standard of "utmost fair dealing." Kimsey v. Fore, 593 S.W.2d 107 (Tex.Civ.App. 1979); Portwood v. Buckalew, 521 S.W.2d 904 (Tex.Civ.App. 1975). In discussing the principle of utmost fair dealing, 2 H. Williams and C. Meyers, Oil and Gas Law § 339.2, at 209-10 (1981) (footnotes omitted) explains:
This standard, it seems to us, comes down to an ordinary, prudent landowner test. The executive is required to exercise his exclusive leasing power in the same manner as an ordinary, prudent landowner would exercise the leasing power inherent in the mineral fee. The executive's conduct will be judged by such standard, as if no royalty or non-executive mineral interest were outstanding. Where the interests of the executive and the non-executive coincide, the failure to exercise the executive right or the improper exercise thereof due to carelessness, inattention, indifference, or bad faith will result in liability. Where the interests of the executive and non-executive diverge, the executive will not be bound to a standard of selfless conduct, such as that imposed on trustees or guardians. He may exercise the executive right with the same self-interest in mind as if there were no outstanding royalty or non-executive mineral interest. But the executive cannot exercise (or refuse to exercise) the executive right for the purpose of extinguishing the non-executive interest, or for the purpose of benefitting himself at the expense of the non-executive.
The case most often cited for the imposition of a covenant to use diligence in obtaining leases is Federal Land Bank v. United States, 168 F. Supp. 788, 144 Ct.Cl. 173 (Ct.Cl. 1958). There, the plaintiff had conveyed land to others but reserved an undivided one-sixteenth nonparticipating royalty interest in the oil, gas, and other minerals for a period of twenty years and so long thereafter as the purchase money note remained unpaid. The United States subsequently obtained title to the property. Despite knowledge of the plaintiff's interest and of the land's potential for the production of oil, the government delayed entering into oil leases until after the expiration of the plaintiff's royalty interest. In holding the government liable for damages, the court said:
We believe as between the mineral fee owner and the royalty owner there is an implied covenant in the deed that the mineral fee owner will use the utmost fair dealing and diligence in obtaining lease agreements in order to protect the royalty owner's interest.
What then would be "utmost fair dealing and diligence" in the circumstances of this case? We are of the opinion that the court should require the same degree of diligence and discretion on the part of the mineral fee holder as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to cooperate with a prospective lessee. See 26 Tex.L.Rev. 569.
The implied covenant of utmost fair dealing and diligence in the case of a royalty interest for a term of years would require this court to impose a somewhat more stringent rule than in the case of an agreement not limited by time. This is necessarily so because the mineral fee owner cannot be permitted to reduce the value of the royalty interest by inaction which would eventually inure to its benefit.
Id. at 791.
Despite the foregoing authorities, both the text writers and the courts have suggested that there are some circumstances in which an implied covenant to exploit the land for oil and gas should not be imposed upon the holder of the executive right. Professor Merrill, who advocates the implication of covenants in most cases, states:
Suppose, instead of a sale of the oil rights, we have a sale of the land itself, with a reservation of a part of the oil *987 interest. Here I think we must realize that there are two possible situations. The transaction may be a sale of the land to a grantee who is interested primarily in exploiting it for agricultural or other purposes, the grantor seeking to retain a share in a possible future mineral development. In such a case the parties do not contemplate that the grantee will embark upon a career of exploration or development and there is no reason for implying any covenant to do so, since fair dealing does not call for it... . On the other hand, the sale may be to an operator for the express purpose of promoting the exploitation of the mineral wealth. In such a case it seems clear that the implied covenants should operate in favor of the grantor and against the grantee.
Merrill, Implied Covenants Between Others Than Lessors and Lessees, 27 Wash.U.L.Q. 155, 160 (1942). See Davis v. Mann, 234 F.2d 553 (10th Cir.1956); Kentucky Natural Gas Corp. v. Carter, 303 Ky. 559, 198 S.W.2d 311 (1946).
Martz and Hames in a comprehensive article in 3 Rocky Mountain Mineral Law Institute make a distinction between reserved and carved out royalty interests:[3]
Similar differences exist between reserved and carved out royalty interests. The reserved royalty is speculative in character. In surrendering executive powers to the mineral grantee, and reserving no express development rights for his royalty protection, the owner of a royalty reservation appears to trust implicitly in the self interest of the mineral owner to obtain development and arguably should not be heard to claim any rights in derogation of his grant. Where a royalty interest, however, is carved out of a larger mineral interest, it is generally conveyed for services necessary to development or for cash to be used in development. If the cash or services are expressly pledged to development, it would appear that the royalty owner can reasonably expect diligence in leasing or drilling operations. Even if not so pledged, it nonetheless appears that the nature of the transaction and the objectives of both parties would look to early development. Reserved royalty is speculative; carved out royalty is developmental. The reserved royalty is an ex parte venture; the carved out royalty is implicitly a joint venture.
Martz and Hames, Implied Rights of Royalty Owners, 3 Rocky Mtn.Min.L.Inst. 195, 197-98 (1957). However, in summing up the authors recommend the implication of a production covenant even in the case of a reserved royalty interest where it is limited to a fixed term or dependent upon production:
From the legal and case analysis of covenent law to this point, it is submitted:
1. That no sound reason exists for not implying covenants freely for the protection of independent royalty owners.
2. That such covenants are implied in fact if the clauses of grant or reservation suggest that the parties intended that the resources be developed in a timely and reasonable manner.
3. That such covenants should be implied in law whenever any motivating purpose of a transaction is development of the contained resource.
4. That development is a motivating purpose, in the absence of express clauses to the contrary, where a royalty is carved out in grant, where it is reserved in a conveyance of surface or minerals without other consideration, where a carved out or reserved royalty is limited to a fixed term or has a term dependent upon production, and possibly where a royalty is reserved out of a mineral grant only, whether or not a substantial cash consideration accompanies it.
5. That in many royalty reservations, particularly where a substantial cash *988 consideration accompanies the reservation, development appears from the facts to be an incidental or speculative purpose only, and covenants should not and are not implied either in law or in fact.
Id. at 216.
In the final analysis, whether to imply a covenant in a particular instrument not otherwise specific on the subject depends upon a determination of the intent of the parties as gleaned from the circumstances surrounding the transaction. By itself, the mere absence of language expressly imposing the duty will not preclude an implication in the proper case. Therefore, the amended complaint was sufficient to state a cause of action. Beyond that, we cannot pass judgment because we simply do not have enough facts. For example, we do not know the true consideration for the agreement.[4] The appellants' brief states that the royalty interest was created as a part of the sale of the land from appellants to appellees, thereby suggesting the possibility of a reserved rather than a carved out royalty interest. However, this is not alleged in the amended complaint and cannot be considered. Whether at the time of the transaction the property was known to have a potential for oil production also remains to be seen. These and other pertinent matters will have to be developed before a proper decision can be made.[5]
The order dismissing the amended complaint is reversed, and the case is remanded for further proceedings.
BOARDMAN, A.C.J., and SCHOONOVER, J., concur.
NOTES
[1] The appellees are the present owners of the land, but some of them were not parties to the agreement because they had not yet acquired an interest in the land.
[2] Most instruments describe the royalty interest as being in the oil, gas, or other minerals produced from the land. See, e.g., Neel v. Rudman, 160 Fla. 36, 33 So.2d 234 (1948). Here, the agreement refers to income or proceeds derived from the disposition of the oil, gas, or other minerals. Absent authority to the contrary, we believe this to be a distinction without a difference.
[3] A reserved royalty is one which is retained by the grantor at the time he conveys a larger interest. A carved out royalty results from the execution of an instrument which creates a royalty interest out of a larger interest which the grantor continues to own.
[4] While the instrument recites a nominal consideration, we note that Florida documentary stamps totalling $12 are affixed.
[5] Of course, if the instrument is ultimately construed to impose an implied duty upon the appellees, there would have to be a further determination of whether this duty had been breached.