701 So.2d 619 (1997)
COASTAL PETROLEUM, a Florida Corporation, Appellant,
v.
Honorable Lawton CHILES, et al., as and Constituting the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, and as and Constituting the Executive Board of the Department of Natural Resources of the State of Florida, Appellees.
No. 96-3035.
District Court of Appeal of Florida, First District.
November 5, 1997.
*621 John K. Aurell of Ausley and McMullen, Tallahassee; Susan W. Fox of MacFarlane, Ferguson & McMullen, Tampa; Robert J. Angerer and Robert J. Angerer, Jr. of Angerer & Angerer, Tallahassee, for appellant.
Robert A. Butterworth, Attorney General; Denis Dean, Chief, Special Projects; Jonathan A. Glogau, Assistant Attorney General, Tallahassee, for appellees.

OPINION ON MOTION FOR REHEARING OR CERTIFICATION
WOLF, Judge.
Appellant's motion for rehearing is hereby granted; however, appellant's motion for certification is denied. Upon rehearing, we issue the following corrected opinion.
Coastal Petroleum Corporation (Coastal) appeals from a final judgment determining that Coastal was not entitled to relief pursuant to inverse condemnation. The trial court determined that a 1990 state statute prohibiting the exploration and drilling for oil in certain areas off the coast of Florida did not amount to a taking of Coastal's property interest in a percentage of royalties from oil taken from the area which was reserved as a result of a previous settlement agreement with the state. We concur in the sound reasoning of the trial court in determining that "[B]ecause of Coastal's lack of a reasonable expectation that the State would lease and its lack of ability to force the State to lease, the State's action in protecting its' [sic] sovereign submerged land by preventing exploration and drilling does not constitute a compensable taking of Coastal's reserved property interest." It is, therefore, unnecessary for us to reach the other reasons given *622 by the trial court for denying Coastal's claim, and we affirm.
The history of this case dates back more than 50 years. On October 4, 1941, Arnold Explorations, Inc. signed an exploration contract and option to lease with the trustees of the Internal Improvement Fund. This contract gave Arnold the right to search for and produce oil and other minerals in lands owned by the state. Coastal Petroleum Corporation purchased Arnold Explorations in 1947. By that time the exploration contract had been modified into three separate leasesspecifically, lease numbers 224-A and 224-B encompassed Gulf coast offshore areas, and lease number 248 covered Lake Okeechobee and other fresh water bodies. The offshore area defined in the leases runs from Apalachicola to six miles south of Naples, from the coast seaward 10.36 miles, an area corresponding to the territorial waters off Florida's west coast.
Before conducting drilling operations, the oil company or the operator of the project tries to determine where conditions are favorable for the formation and accumulation of oil and gas. The operator looks for conditions which are favorable for the formation of oil and gas. A basin is defined as "prospective" if it has yielded or gives evidence that it might yield oil or gas. It is "condemned" if it yields evidence that oil and gas cannot exist.
After 1947, Coastal began to conduct geologic and seismic studies to locate oil and other minerals within the area covered by the leases. Thirteen wells were drilled, but Coastal did not find any oil or gas except in one location known as Forty Mile Bend which was an inland area not covered by the statute. Coastal was joined by The California Company and later by Mobil Oil Corporation. Together they drilled nine other offshore wells, but again no oil or gas was discovered. In all, more than $16,000,000 was spent on the leases before 1968. A great deal of information was gathered, but no oil was ever produced in the offshore area covered by the leases.
In the late 1960s, a dispute arose concerning Coastal's right to mine limestone beneath Lake Okeechobee. This dispute resulted in federal litigation between Coastal, the trustees, and the Army Corps of Engineers. The United States District Court for the Southern District of Florida ruled in Coastal's favor and the trustees appealed. Settlement discussions began during the course of the appeal and continued until January 6, 1976, when the case was resolved. The agreement was reduced to writing in a memorandum of settlement between the state and Coastal dated January 6, 1976.
In the memorandum of settlement, Coastal surrendered a substantial portion of the area covered by the leases, agreeing to retain active rights to explore only in the most offshore portion of the original area to which the leases pertained (7.36-10.36 miles offshore). The "middle strip" (4.36-7.36 miles offshore) was surrendered by Coastal to the state (as specifically allowed by paragraph 16 of the leases, as modified), and Coastal retained no rights whatsoever to that area. Also, pursuant to section 16 of the lease, Coastal surrendered its interest in the near shore portion (coast to 4.36 miles offshore), retaining only a "residual royalty." The residual royalty interest entitled Coastal to 6.25 percent of all oil and gas produced on the offshore area until the year 2016. Additional conditions of the settlement required Coastal (1) to continue paying rentals on the areas where it retained an active interest; (2) to comply with environmental regulations in effect at the time of drilling; (3) to release any and all interests to the state in the year 2016 (unless production is ongoing); and (4) not to interfere in any state land use decisions.
The agreement is silent as to whether the trustees have a duty to cooperate with prospective lessees or whether the state may simply prohibit leasing, permitting, and drilling in the royalty areas. Coastal's royalty interest could produce a financial return only if an oil company were to lease the land within the area covered by the royalty interest and then only if the oil company were to locate and produce oil under the terms of the lease. However, the agreement does not contain any provision that requires the state to lease any of the property. The president of Coastal Petroleum testified that he assumed *623 the state had an obligation to lease the land as part of the overall agreement. Several witnesses testified for the state that the state retained the discretion as to whether to grant any leases.
The trial court made the following findings of fact:
Some experts believed that the royalty area was "prospective" for oil in 1976 at the time of the settlement agreement. However, this opinion is refuted by experience. The years before the settlement were marked by one drilling failure after another. The lack of any real potential for the recovery of oil in sufficient quantities is further verified by events occurring after the settlement. During the 15-year period from 1976 to the filing of this suit in 1990, no third party had requested the state to grant any leases in Coastal's royalty area. Taking all of these facts into account, the court finds that the royalty area was not "prospective" for oil at the time of the 1976 memorandum of settlement.
On May 8, 1990, the Board of Trustees of the Internal Improvement Trust Fund and the Department of Natural Resources, now known as the Department of Environmental Protection, adopted the following policy:
The policy of the Governor and Cabinet, sitting as the head of the Department of Natural Resources and as the Board of Trustees of the Internal Improvement Trust Fund, is to prohibit seismic activities using explosives and to prohibit the drilling, exploration, or production of oil and gas resources from structures located in the sovereign waters of the State of Florida, including bays, estuaries, freshwater lakes, rivers and streams.
The Florida Legislature in July of 1990 enacted chapter 90-72, Laws of Florida (section 377.242) which provided in pertinent part:
After July 31, 1990, no oil or natural gas lease shall be granted, sold, or executed covering lands located north of 26 00'00" north latitude off Florida's west coast to the western boundary of the State bordering Alabama as set forth in s. 1, Art II of the State Constitution.
The legislation also provided that no structure intended for drilling or production of oil, gas, or other structure may be constructed in the relevant areas.
Coastal then filed this lawsuit which alleged that chapter 90-72, Laws of Florida, effected a taking of Coastal's percentage interest in any royalty payments, and sought compensation for the alleged taking. Both parties moved for summary judgment and Coastal also moved for a partial summary judgment. Coastal's motions were denied and summary judgment in the state's favor was reversed by the First District Court of Appeal "[b]ecause genuine issues of material fact exist." Coastal Petroleum Co. v. Chiles, 656 So.2d 284 (Fla. 1st DCA 1995).
After a nonjury trial, the trial court determined that (1) Coastal did not possess a property right which could constitute a basis for an action against the state for the purpose of eminent domain; (2) "because of Coastal's lack of a reasonable expectation that the State would lease and its lack of ability to force the state to lease, the State's action in protecting its sovereign submerged lands by preventing exploration and drilling did not constitute a compensable taking of Coastal's reserved royalty interest," and (3) under the analysis adopted by the supreme court in Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981), the 1990 legislation does not effect a taking of property. We agree with the trial court's determination as to the first two points; therefore, it is unnecessary to reach the third issue.
In determining whether a property owner has a right to recover damages pursuant to an action for inverse condemnation based on an enactment of a governmental regulation, it is necessary to determine (1) the nature and extent of the property interest held by the plaintiff; (2) whether that property interest is one which will entitle the landowner to protection pursuant to the laws of inverse condemnation; (3) the extent that the government's regulation interferes with the plaintiff's enjoyment of the protected property right; and (4) whether the governmental regulation effects a taking of property *624 pursuant to the dictates of Graham v. Estuary Properties, supra. Normally, the focus in inverse condemnation actions are issues three and four. Our focus in the instant case is issues one and two. Because we find that the trial court correctly ruled as to issues one and two, it is unnecessary to deal with issues three and four.
Appellant correctly argues that in determining the extent of their property interest which was created pursuant to the settlement agreement in 1976, we must not only look at the agreement itself but the applicable law and constitutional provisions as they existed at the time of the agreement. See Board of Pub. Instruction v. Town of Bay Harbor Islands, 81 So.2d 637, 643 (Fla. 1955). Coastal asserts that their interest in royalties from the disputed leases was unconditional because section 253.52, Florida Statutes (1975), created a duty to grant oil and gas leases on public lands on the part of the Board of Trustees of the Internal Improvement Trust Fund except under limited circumstances. We cannot agree with appellant, however, that this statutory provision created an unconditional obligation on the part of the state to lease the land for oil exploration if there is a demand and it makes economic sense to do so.
Section 253.52 provided, in pertinent part,
Placing oil and gas leases on market by board.Whenever in the opinion of the Board of Trustees of the Internal Improvement Trust Fund there shall be a demand for the purchase of oil and gas leases on any area, tract, or parcel of the land so owned, controlled, or managed, by any state board, department, or agency, then the board shall place such oil and gas lease or leases on the market in such blocks, tracts, or parcels as it may designate.
§ 253.52, Fla. Stat. (1975) (emphasis added). As explored in more detail later on, this statutory provision must be read in conjunction with the public trust doctrine contained in the constitution as well as the general police powers of the state to protect the public health, safety, and welfare.
Appellant relies on the case of Welles v. Berry, 434 So.2d 982 (Fla. 2d DCA 1983), for the proposition that when a party is granted a royalty interest in oil, gas, and minerals, there is an implied covenant (of fair dealing) on the part of the grantor that they will continue to make good-faith efforts to lease the property so as to not defeat the interest of the holder of the royalty interest. Welles is inapplicable for a number of reasons. First, the state, unlike private property owners, is not necessarily holding land in order to obtain an economic benefit. All state lands are held as a public trust.
The public trust doctrine is embodied in article X, section 11 of the Florida Constitution:
The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.
Unlike Welles, the failure to lease in the instant case did not involve an attempt to defeat the royalty interest of Coastal.
In regard to the public trust doctrine, the trial court specifically found as follows:
Under the reservation of the public trust doctrine, the state has an affirmative obligation to restrict or eliminate private activity on sovereign lands when such activity becomes contrary to the public interest. Article X, section 11, Florida Constitution confirms this obligation. The present situation is a clear example of action taken by the state pursuant to the public trust doctrine. The Florida Legislature determined in 1990 that future oil and gas drilling on sovereign lands in the near shore waters of the state would be detrimental and contrary to the public interest.... By enacting the law [90-73] the Florida Legislature was merely exercising its constitutional authority to protect the lands held in trust for all the people.

(emphasis added).
In addition, unlike Welles, there is support in this case for the proposition that *625 the parties understood that the trustees had the discretion to lease or not lease the land during the terms of the agreement. The public trust doctrine as well as the responsibility of the state to exercise their police powers for the good of the public support this position. The language of the agreement itself acknowledges the state's rights to control the use of the land in question. Finally, there is conflicting testimony by witnesses for the parties concerning the state's discretion to lease the area in question during the terms of the agreement. It was within the trial court's discretion to resolve these conflicts in favor of the state.
The appellant argues, however, that even though the state may have been acting in the public trust in enacting chapter 90-72, Laws of Florida, any private property taken for public use, even under the public trust, is protected by the constitution and requires compensation. See Art. X, § 6(a), Fla. Const. The appellant relies on Askew v. Gables-by-the-Sea, Inc., 333 So.2d 56 (Fla. 1st DCA 1976), cert. denied, 345 So.2d 420 (Fla.1977), and Zabel v. Pinellas County Water & Navigation Control Auth., 171 So.2d 376 (Fla.1965), for this proposition. Although appellant correctly argues that the public trust doctrine does not preclude a party from asserting that state regulation has resulted in a compensable taking of an interest in property obtained from the state, not all interests obtained from the state are entitled to the same constitutional protections.
In Askew and Zabel, parties that had obtained fee title to sovereign submerged lands from the state were found to have a private property right which would be protected by the constitutional takings provision if the state precluded all reasonable use of the land. Similarly, in State v. Leavins, 599 So.2d 1326 (Fla. 1st DCA 1992), this court held that a lease which provided for the immediate taking of oysters from Apalachicola Bay was a valid property right entitled to protection.[1] Those cases are distinguishable, however, in that the interest in the instant case is not a fee interest as in Askew and Zabel, nor does this case involve an immediate right to remove presently existing resources as in Leavins.
In Marine One, Inc. v. Manatee County, 898 F.2d 1490 (11th Cir.1990), the court ruled that certain interests in property obtained from the state are not sufficient to rise to the level of a protectable property interest under the law of inverse condemnation. In Marine One, the court found that a mere license or permit to use land was not a protected property right which could be taken where the interest was obtained subject to the public trust doctrine. See id. at 1492-1493. The interest in this case is more nebulous than the one identified in Marine One. In the instant case, Coastal retained a right to a royalty only if someone in the future decided to mine resources which may or may not exist in the area in question. In fact, during the 15-year period prior to the enactment of the law in question, no one had requested an oil lease in this area. In addition, in the period prior to the 1976 settlement, none of the numerous test oil wells drilled in this area had yielded any oil. The trial court therefore made the factual finding that this area was not prospective for oil.[2] As previously mentioned, the state retained the right to control land uses over the area in question. Under all the circumstances existing in this case, we conclude that the trial court was correct in determining the mixed question of law and fact that the interest of Coastal Petroleum in the land in question was too speculative to be protected through the means of inverse condemnation.
AFFIRMED.
JOANOS and VAN NORTWICK, JJ., concur.
NOTES
[1] Leavins was not an inverse condemnation action, but a case where the regulation outlawing the use of any mechanized dredge or rake for purposes of taking oysters in Apalachicola Bay constituted unconstitutional impairment of existing contractual rights.
[2] We read the trial court's factual determination to indicate that based upon surrounding circumstances, it was purely speculative as to whether any oil existed in this area, a determination which is supported by the evidence contained in the record.