**STATE OF ALASKA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–454L.**

United States Court of Federal Claims.

May 31, 1996.

Harold M. Brown, Anchorage, Alaska, for plaintiff. Stephen V. Bomse, San Francisco, California, Peggy J. Williams, Seattle, Washington, Kathleen M. Sullivan, Stanford, California, and G. Thomas Koester, Juneau, Alaska, of counsel.

Margaret M. Sweeney, Washington, D.C., and Bruce M. Landon, Anchorage, Alaska, with whom was Assistant Attorney General Lois J. Schiffer, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

The State of Alaska alleges that the United States is liable for breach of contract damages for not living up to certain terms of the Alaska Statehood Act, or in the alternative, that it has taken the State's property without just compensation in violation of the Fifth Amendment to the United States Constitution. Pending is Alaska's motion for partial summary judgment and defendant's cross-motion for summary judgment. The State's motion only addresses count V of its complaint. Alaska asks the court to determine if the Alaska Statehood Act ("Statehood Act") is a binding and enforceable contract between it and the United States, and whether or not the United States has breached its obligation under section 28(b) of the Statehood Act. Specifically, the State alleges that section 28(b) granted to Alaska the right in perpetuity to receive 90 percent of the gross proceeds derived from mineral leases on federal lands in Alaska under the Mineral Leas-

ing Act of 1920. 30 U.S.C. §§ 181–287 (1994). Defendant's motion is comprehensive. It asserts that counts I through IV of the complaint are time barred under 28 U.S.C. § 2501 (1994), and, even if those four counts are timely, the entire complaint, including count V, is wholly without merit.[1] The matter has been extensively briefed. Oral argument was held in Anchorage, Alaska on April 30, 1996. For the reasons set forth below, plaintiff's motion is denied and defendant's motion is granted.

## BACKGROUND

*The Struggle for Statehood*

In 1867, in one of this nation's most far-sighted expenditures, Secretary of State William H. Seward purchased the entire territory of present-day Alaska from Russia for $7,200,000. In Aleut, Alaska means "The Great Land." It is aptly named. Alaska is unique in its size, grandeur, natural resources, strategic location, spectacular scenery and wildlife. This vast land was organized into the Territory of Alaska in 1912. Beginning in 1916, efforts were made in Congress to admit Alaska as a State. 104 CONG. REC. 9339 (1958) (First introduced by Delegate Wickersham). Alaskan statehood was not taken seriously, however, until after World War Two, when an Alaska Statehood Bill was introduced in every Congress between 1946 and 1958. Finally, after much debate, the Territory of Alaska was admitted as the forty-ninth State of the Union on January 3, 1959.

Alaska's admission into the Union did not come easily. For reasons that will become apparent in the discussion below, the State urges the view that the primary reason for delay was concern over the financial wherewithal of a State of Alaska. The Federal

1. Count I of the complaint alleges that the United States has breached the Statehood Act by its pattern of withdrawing federally owned lands in Alaska from mineral leasing and by its diminution of Alaska's 90 percent share of mineral leasing revenues. Count II asserts that the people of Alaska relied on Congress' promise to develop federal mineral lands in Alaska and the Government's failure to do so amounts to a breach of contract. Count III alleges that Congress has breached the implied covenant of good faith and fair dealing by withdrawing federal lands from mineral leasing. Count IV alleges that Congress' withdrawal of lands from mineral leasing amounts to a taking of Alaska's interest in mineral leasing revenues to be derived from those lands. Count V charges that the United States has violated section 28(b) of the Statehood Act by deducting administrative costs prior to the disbursement of 90 percent of mineral leasing revenues to the State.

Government contends that the State has exaggerated the significance of that concern. A review of the legislative history suggests that, while financial support for the State was a major concern for the proponents of statehood, that concern was the most readily addressed by legislation as the statehood "package" evolved over forty years. The real opposition to statehood was based on other factors that were more difficult to resolve.

Alaska is enormous. It is more than twice the size of the next largest State, Texas. Immediately prior to statehood, however, virtually all of its 365 million acres were owned by the Federal Government. Because those lands could not be taxed, there was concern that it would be difficult for Alaska as a State to raise sufficient revenue to carry out the responsibilities of statehood. This fear was expressed by the Library of Congress' Legislative Reference Service in a report on possible statehood for Alaska and Hawaii:

> No doubt exists as to the ability of Hawaii to bear the cost of statehood, although this question has been raised with regard to Alaska. The potential revenue problem in Alaska is made more acute by the existence of federal land holdings totaling more than 98 percent of its area. Suggestions have been made that this situation must be resolved before Alaska is granted statehood ... The undeveloped state of Alaska's resources and its meager population have caused opponents of statehood to charge that the Territory would not be able to bear the costs of statehood.

Library of Congress, *Public Affairs Abstracts,* "Statehood for Alaska and Hawaii" Vol. 1, No. 20 (Dec. 1950) at 2.[2] Many Alaskans shared Congress' concern that Alaska's economy might be unable to support the heavy financial burden of statehood.[3]

Defendant contends, however, that Alaska was in an enviable financial position on the eve of statehood. It cites an Interior Department report, reprinted in the Congressional Record, that states, "Alaska had the only government in the 48 States, Hawaii, Puerto Rico, and Alaska, which had no outstanding debt at the close of fiscal year 1957." 104 CONG.REC. 12,332 (1958). The Alaska Statehood Committee concluded that "Alaska cannot afford *not* to become a state." U.S.App. at 126,[4] ALASKA STATEHOOD COMMITTEE, AN ANALYSIS OF THE COST OF STATEHOOD

---

2. In addition, in 1947, the House Subcommittee on Territorial and Insular Possessions reported: Opponents argue that ... the expense of statehood is too great for Alaska to bear, since the sources of revenue for Alaska as a State are so uncertain; that Federal reservations would deprive the State of revenue from, and jurisdiction over, vast areas.... STAFF OF HOUSE SUBCOMM. ON TERRITORIAL AND INSULAR POSSESSIONS OF PUBLIC LANDS COMM., 80TH CONG., 1ST SESS., REPORT ON H.R. 206, A BILL TO PROVIDE FOR THE ADMISSION OF ALASKA, THE FORTY-NINTH STATE 8 (Comm.Print 1947); *see also* S.REP. No. 1163, 85th Cong., 1st Sess. 11 (1958) (summarizing the financial arguments against statehood: "The economic conditions in Alaska are unstable ... the resources of the Territory are not sufficiently developed to allow private enterprise to take up the slack in employment and provide necessary revenues should Federal spending be abruptly curtailed."); 104 CONG.REC. 12,314 (1958) (Senator Monroney stating, "I am deeply concerned about the very thin economy of Alaska.... Unless a more solid economic foundation is built under it, Alaska will not be able to carry on successfully its duties and obligations and to assume the full responsibilities of a State."); 104 CONG.REC. 12,442 (1958) (Senator Johnston stating, "I do not believe the people of Alaska are able to sustain the financial burden involved.").

3. The Congressional Record reprinted numerous letters to Congress from citizens of Alaska who were opposed to statehood, as well as several anti-statehood editorials from Alaskan newspapers. *See, e.g.,* 104 CONG.REC. 12,149 (1958) ("Most of the people of southwestern Alaska do not favor statehood at this time.... The increased costs of statehood would make further [industrial] development impossible."); *id.* at 12,315 ("The majority of us bona fide Alaskans ... have always felt the Representatives and Senators in Washington, D.C., knew that Alaska cannot support statehood, at this time...."); *id.* at 12,316 ("Statehood now for Alaska will bankrupt us and set our industrial growth back a generation."); *id.* at 12,340 ("Alaska needs a 10–year moratorium on the statehood issue.... During this moratorium we can put our house in order to develop industry so that we can afford statehood at the end of 10 years."); *id.* at 12,341 ("To finance the added costs of statehood we would have to increase our present punitive taxes to a prohibitive one.").

4. "U.S.App." refers to the Appendix filed May 15, 1995, by the United States along with its Motion for Summary Judgment.

TO ALASKA, 13 (Feb. 1, 1957) (emphasis in original). The August 1957 Senate Report on Alaskan Statehood stated:

Alaska has had a net surplus in its budget for the last few years, and has provided the basic services of State government except those precluded by the organic act. The services were provided and paid for without incurring any bonded indebtedness. There is no sales tax in Alaska and no property tax at the present time except in cities and incorporated districts: but based upon the amount collected in 1956, the yield for the next biennium will be about $41 million without imposing any additional taxes.

S.REP. No. 1163, 85th Cong., 1st Sess. 13 (1957).

Senator Jackson of Washington, one of the main proponents of statehood in the Senate, also did not view financial stability as a major concern. Instead, he stated:

Alaska is a going concern. As a matter of fact, Alaska is currently financing, by means of its own revenues, all functions and services it is permitted to carry on. The Territorial government has no debt, and actually has a cash surplus. The additional activities Alaska would engage in after statehood is granted can normally be expected to be financed through the additional revenues which would also become available to Alaska as a State.

104 CONG.REC. 12,012 (1958).

While lack of financial wherewithal was of great concern to proponents of statehood, that was only one of many concerns of statehood opponents, and arguably it was not the most important. One of the leading opponents, Representative Aspinall of Colorado, classified the arguments against statehood into three categories: geography, population and political immaturity. 104 CONG.REC. 9490 (1958). *See also* 104 CONG.REC. 9494 (1958). The geographic objection was that the Alaskan territory was separated from the contiguous 48 States by another country, namely Canada. *See, e.g.,* 104 CONG.REC. 9358 (1958) (Senator Rogers stating that non-contiguity is "probably the most important factor."); 98 CONG.REC. 1500 (1952) (same by Senator McFarland). Opponents felt the

State would be too far removed from the mainland United States to have the same interests. 104 CONG.REC. 12,024 (1958).

Lack of population was also continuously stressed during the debates as a reason to deny statehood to Alaska. In 1940, there were only 72,524 people in the entire territory. STAFF OF SUBCOMM. ON TERRITORIAL AND INSULAR POSSESSIONS OF PUBLIC LANDS COMM., 80TH CONG., 1ST SESS., REPORT ON H.R. 206, A BILL TO PROVIDE FOR THE ADMISSION OF ALASKA, THE FORTY-NINTH STATE 1 (Comm.Print 1947). By 1958, the population had grown to around 212,500 people, 50,000 of whom were military personnel. 104 CONG.REC. 12,207 (1958). Even in 1958, however, the most persistent complaint that appears in the Congressional Record is that there were still not enough people to form a State, particularly in an area as large as Alaska. As Representative Davis of Georgia stated in 1958, "My own home county, . . ., in the State of Georgia has more people in it than the entire Territory of Alaska." 104 CONG.REC. 9494 (1958); *see also* 98 CONG.REC. 1516, 1530–31 (1952); 104 CONG.REC. 12,022 (1958) (Senator Robertson); *id.* at 12,048 (Senator Thurmond stating, "[T]he population per square mile is very much smaller than that in even our most sparsely settled States.").

Although the argument was often made that there was not sufficient population to build an economy, it is clear that the real concerns were less altruistic. Apparently many Senators and Representatives questioned the wisdom of Roger Sherman's Connecticut Compromise, incorporated in the United States Constitution for bridging the competing interests of large and small states. The debate is replete with transparent jealousy over the fact that so few people in Alaska would be able to elect two senators. *See* 104 CONG.REC. 9221 (1958) ("[D]eep down in our minds it is the prevailing objection, perhaps the most important to many Members. Very simply put, it is this: Should 212,000 people have two representatives in the United States Senate when a State such as New York, with 16 million people, has the same number."); 104 CONG.REC. 9224 (1958); 98 CONG.REC. 1525 (1952); 98 CONG.REC. 1528 (1952).

Concern over Alaska's asserted lack of political maturity was based, in part, on the view that Alaska had been too dependent on the Federal Government and had not developed its own political identity. *See* 104 CONG. REC. 9491 (1958).

There were a number of other arguments that recur in the debates. For example, several Senators and Representatives repeatedly expressed concern that giving statehood to Alaska and Hawaii, would cause other commonwealths, territories or possessions to apply for statehood, e.g., Puerto Rico, American Samoa, the Virgin Islands, and Guam. *See* 98 CONG.REC. 1500 (1952); *id.* at 1521; *id.* 1531–32; 104 CONG.REC. 9229 (1958); 104 CONG.REC. 9357 (1958).

Other objections were that transferring to state control land so close to the Soviet Union was a security risk. There were also sectional concerns as to how senators from Alaska and Hawaii would vote on the key issues of the day, i.e. civil rights. In addition, there were allegations of a communist menace in the labor unions in the two territories.

From the vantage point of 1996 it is easy to discount these objections. In retrospect many seem, at best, wrong-headed, trivial, or based on self-interest. Nevertheless, the court has carefully read the entire legislative history and it is impossible to come away from that project with a sense that the provision for finances was, in the end, the key to achieving statehood for Alaska. Of all the problems identified, real or imaginary, financial stability was the most susceptible to a legislative fix. The population issue was somewhat defused as the Territory grew in population. The other problems, however, were more political in nature and hence less tractable.

In the years between 1916 and 1958, the statehood "package" became more generous to Alaska. Although there were several devices adopted in the final act to augment the financial well being of the new State, the most dramatic evidence of the increasing breadth of the statehood package was the incremental increases of proposed federal land grants to the State. It is clear from the entire record that the land grant was seen as the main vehicle for making Alaska free from dependence on the central government.[5]

The first land grant proposals were modeled after legislation granting statehood to other territories. The 1948 statehood legislation proposed that Alaska would get certain limited direct grants, and four sections per township for school use, the same as offered to other western States upon their admission. H.R.REP. No. 1731, 80th Cong., 2d Sess. 13, 15 (1948). One problem with this approach was that the State could only select lands after survey. Virtually none of Alaska had been surveyed, however, and it was anticipated that the process would literally take hundreds of years. By 1950, the proposal was to allow Alaska to choose 21 million acres, without a survey, over a period of twenty five years. S.REP. No. 1929, 81st Cong., 2d Sess. 11 (1950). By 1953, the amount had been raised to 100 million acres. H.R.REP. No. 675, 83d Cong., 1st Sess. 9 (1954). In 1954, the amount was 103,350,000 acres. S.REP. No. 1028, 83d Cong., 2d Sess. 3 (1954). In 1957, the amount was increased to 182,800,-000 acres. H.R.REP. No. 624, 85th Cong., 1st Sess. 2 (1957), U.S.Code Cong. & Admin.News 1958, pp. 2933, 2934. The same amount was proposed during 1958, but concerns by some opposed to statehood that such a large land grant constituted an unprecedented "giveaway" led one of the spon-

---

**5.** The reasoning for this is made clear by the Senate report accompanying the Statehood Bill. The report stated that,

> [t]he expenses of the State of Alaska will be comparatively high, partially due to the vast land areas within the State; but the State would be able to realize revenues from only 2 percent of this vast area unless some provisions were made to modify the present land ownership conditions.

S.REP. No. 1163, PROVIDING FOR THE ADMISSION OF THE STATE OF ALASKA INTO THE UNION, 85th Cong., 1st

Sess. 2 (1957). The Statehood Bill would "provide out of the vast Federal domain in Alaska sufficient lands and resources to permit the new State to earn its continuing economic independence and growth." S.REP. No. 1163, 85th Cong., 1st Sess. 1 (1957); *see also* S.REP. No. 1929, 81st Cong., 2d Sess. 11 (1950) (It was hoped that "such a grant, with its power of selection, [would] be of great benefit to the State in meeting the financial obligations of statehood.").

sors of the legislation, Representative O'Brien of New York, to propose a reduction in the grant to the State to 103,350,000 million acres.[6] *See* 104 CONG.REC. 9219 (1958).

Even with the power to choose such an unprecedented [7] amount of land, and the fact that the conveyances included the mineral as well as surface estates, it was feared that the land grants would not be effective. Under each of the proposals to give land to Alaska, the State would be limited in its selection to lands that had not been specifically withdrawn from public use by the Federal Government. This was a significant limitation as the Federal Government had already withdrawn huge areas of land. As of 1954, 95 million acres were enclosed within various types of Federal withdrawals and reservations. S.REP. No. 1028, 83d Cong., 2d Sess. 3 (1954). Statehood proponents were concerned that many of these withdrawals potentially involved the most productive land in the Territory. S.REP. No. 1028, 83d Cong., 2d Sess. 3 (1954); S.REP. No. 1929, 81st Cong., 2d Sess. 35 (1950).

The largest single withdrawal occurred in 1943, when the Department of the Interior withdrew from mineral leasing 67,440,000 acres of land in three separate areas of Alaska. Public Land Order ("PLO") 82, 8 Fed. Reg. 1599 (1942). These areas include all of the North Slope of Alaska, large areas of the Alaska Peninsula and the Katalla–Yakataga area on the Gulf of Alaska. *Id.* The land was withdrawn "for use in connection with the prosecution of [World War Two]." *Id.* In 1946, approximately 18,640,000 acres of the land withdrawn in PLO 82 was released for leasing. Public Land Order 323, 11 Fed. Reg. 9141–42 (1946). The remaining 48,800,-000 acres continued to be withdrawn, however. *Id.* In 1957, prior to the passage of the Statehood Act, Secretary Seaton opened

twenty million acres of that withdrawal to leasing. Alaska Supp.App. 1,[8] Dept. of Interior Press Release (Nov. 20, 1957). Twenty-three million acres remained withdrawn as Naval Petroleum Reserve No. 4. *Id.* The remaining 5 million acres were reserved, along with an additional 4 million acres, to form the Arctic National Wildlife Range ("ANWR"), the nation's largest wildlife refuge.[9] *Id.* at 2. According to Secretary Seaton's Land Order, however, ANWR would be open to mineral leasing and mining. *Id.* at 4. These withdrawals were again modified on April 18, 1958, to allow certain other areas to be opened to mineral leasing. Public Land Order 1621, 23 Fed.Reg. 2637–38 (1958). Other withdrawals continued, however. The Department of the Interior periodically withdrew portions of Alaska from mineral leasing including parts of the Kenai Moose Range in August 1958. *Duesing v. Udall*, 350 F.2d 748, 750 (D.C.Cir.1965), *cert. denied*, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966).

Because of these and other withdrawals, several Senators felt that the land grant would be of little assistance to the fledgling State. Senator Butler of Maryland stated:

> Much of the best land and most valuable resources of the Territory have been reserved or withdrawn from use by private industries or corporations.
>
> . . . .
>
> There are so many land reserves and withdrawals that there has never been any complete, accurate tabulation of them all. One tabulation, which may be reasonably complete, shows a total of 98,500,000 acres in withdrawals out of the 365,481,600 acres in Alaska (p. 421, Senate hearings). This area is about the size of the State of California and represents about 27 percent of Alaska's total area. *More important, it comprises almost all of the best and most*

---

6. The proposed 103,350,000 acres included a direct grant of 102,550,000 acres of unreserved federal land to be selected over a period of 35 years, 400,000 acres of land located within national forests for community development and expansion purposes selected over 35 years, and an additional 400,000 acres, also chosen over 35 years, to be used for community and recreation areas. 48 U.S.C. *note prec.* § 21 (1994).

7. S.REP. No. 1163, 85th Cong., 1st Sess. 2 (1957).

8. "Alaska Supp.App." refers to the two volumes of Plaintiff State of Alaska's Supplemental Appendices filed July 24, 1995.

9. The remaining land, approximately 800,000 acres, would serve as a buffer zone around Naval Petroleum Reserve No. 4. Alaska Supp.App. 1 at 2, Dept. of Interior Press Release (Nov. 20, 1957) at 2.

*valuable resources known to exist in the Territory.*

S.Rep. No. 1929, 81st Cong., 2d Sess. 34–35 (1950) (emphasis in original); *see* H.R.Rep. No. 624, 85th Cong., 1st Sess. 7–8 (1957), U.S.Code Cong. & Admin.News 1958, p. 2939 (stating, "[T]remendous acreages of land in Alaska have been tied up in the status of Federal reservations and withdrawals for various purposes.... [T]his practice has been carried to extreme lengths in Alaska, to a point which has hampered the development of such resources for the benefit of mankind.... The committee feels that this policy must be changed if Statehood for Alaska is to be a success.").

Concern about the extent of federal withdrawals not only prompted increases in the proposed land grant to the State, but also led to other attempts to bolster the new State's revenue sources. For example, Alaska would be entitled to receive five percent of the net proceeds of the sale of federal lands. In addition, one of the income sources viewed then as most useful would be proceeds from the Pribilof Island seal fisheries. There would also be revenues from fish and wildlife licenses, as well as 25 percent of receipts from national forests. 104 Cong.Rec. 9511 (1958).

The most critical provision to the present lawsuit, however, was added to the statehood package in 1957. It was a provision to amend the Mineral Leasing Act ("MLA") to increase Alaska's share of mineral leasing revenues. That Act, adopted in 1920, governs the procedures for the issuance and administration of mineral leases on federal lands. *See* 30 U.S.C. §§ 181–287 (1994). Specifically, section 35 of the MLA, codified at 30 U.S.C. § 191, covers the disposition and disbursement of royalties received from certain federal mineral leases.

Prior to 1957, section 35 read, in relevant part, as follows:

All money received from sales, bonuses, royalties, and rentals of public lands ... shall be paid into the Treasury of the United States; 37½ per centum thereof shall be paid by the Secretary of the Treasury as soon as practicable after December 31 and June 30 of each year to the State or the Territory of Alaska within the boundaries of which the leased lands or deposits are or were located; said moneys to be used by such State, Territory, or subdivisions thereof for the construction and maintenance of public roads or for the support of public schools or other public educational institutions, as the legislature of the State or Territory may direct; and, excepting those from Alaska, 52½ per centum thereof shall be paid into, reserved and appropriated, as a part of the reclamation fund created by [the Reclamation Act]....

30 U.S.C. § 191 (1952).[10] Because Alaska was not covered by the Reclamation Act of 1902,[11] it was not eligible for the additional 52½ percent. In practical terms, therefore, Alaska, unlike the existing States, received only 37½ percent of revenues from federal mineral leasing within Alaska.

The process by which the proposed amendment to section 35 became part of the statehood proposal is of consequence to this lawsuit. The issue was first raised in 1957, when, independently of the Statehood Bill, Alaska Delegate Bartlett proposed to amend section 35 to give Alaska the entire 90 percent revenue distribution. H.R. 3477, 85th Cong., 1st Sess. (1957). During the debate on statehood that year, however, both Assistant Secretary of Interior Chilson and Senator Barrett of Wyoming recommended including the provision in the statehood legislation then under consideration rather than in stand-alone legislation. H.R.Rep. No. 156, 85th Cong., 1st Sess. 2–3 (1957); *Alaska Statehood: Hearings on S. 49 and S. 35 Before the Senate Comm. on Interior and Insular Affairs,* 85th Cong., 1st Sess. 31–32, 66–67 (1957). Neither Barrett nor Chilson indicated why that change should go into the Statehood Bill. Nevertheless, the proposal was incorporated into

---

**10.** Alaska began receiving 37½ percent of mineral royalties when the MLA was amended in 1947.

**11.** The Reclamation Act of 1902 established a fund to promote the development of arid lands through irrigation. 43 U.S.C. § 372 *et seq.* (1994), 32 Stat. 388 (1902).

section 28(b) of the Statehood Bill. It was understood that the proposal, if adopted, would give Alaska a total of "ninety percent of the [royalty] income from the minerals under the [Mineral] Leasing Act...." *Alaska Statehood: Hearings on S. 49 and S. 35 Before the Senate Comm. on Interior and Insular Affairs,* 85th Cong., 1st Sess. 31 (1957) (statement of Senator Barrett).

Senator Barrett and others argued that the fact that the Territory of Alaska did not receive Reclamation Act revenues was unfair, and that eliminating that unfairness would also provide the Territory or State of Alaska with additional revenues. In discussing the fact that Alaska received only 37½ percent of leasing revenues, Barrett stated:

> I think it would be eminently fair and just and right and proper, when we write this bill up, that we provide here that the Leasing Act [be amended to include an additional 52½ percent]. [G]ive the Territory now and the state of Alaska to be ninety percent of the income from the Leasing Act royalties that come in from now on out. I believe you need it; I think it ought to be done.

*Alaska Statehood: Hearings on S. 49 and S. 35 Before the Senate Comm. on Interior and Insular Affairs,* 85th Cong., 1st Sess. 31 (1957); *see* H.R.Rep. No. 156, 85th Cong., 1st Sess. 2 (1957). This view was also supported by a House Report discussing section 28:

> Subsection (b) amends the act to promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain approved February 25, 1920 [the MLA], by providing that 52½ percent of the proceeds received therefrom shall be covered into the State treasury for disposition by the State legislature.
>
> The payments of these proceeds is recommended in return for Alaska not being covered by the Reclamation Act of 1902, as

amended. The Reclamation Act provides that 52½ percent of the oil and gas revenues goes into the reclamation fund; 37½ percent is returned to the respective States and the remaining 10 percent is retained by the Federal Government for administration purposes.

H.R.Rep. No. 624, 85th Cong., 1st Sess. 23 (1957), U.S.Code Cong. & Admin.News 1958, pp. 2955–56.

The 1957 Statehood Bill did not pass, however. Instead, Congress elected to adopt Senator Barrett's proposal as a separate amendment to the MLA. Enacted in 1957, Public Law 85–88 ("P.L. 85–88") provided that the Territory of Alaska would receive the additional 52½ percent, not through the Reclamation Act as in the case of other States, but by appropriating the money directly for disposition by the Territorial Legislature. Act Relating to Moneys Received from Mineral Lands in Alaska, Pub.L. No. 85–88, 71 Stat. 282 (1957) (amending 30 U.S.C. § 191). P.L. 85–88 states:

> [Section 35 of the MLA] ... is hereby amended by inserting immediately before the colon preceding the first proviso thereof the following ", and of those from Alaska 52½ per centum thereof shall be paid to the [Territory] of Alaska for disposition by the legislature thereof."

Thus, even before statehood legislation was adopted the following year, the Territory began receiving 90 percent of the gross proceeds generated under section 35 of the MLA.[12]

When a new Statehood Bill was introduced the following year, Senator Barrett's proposal to amend the MLA was again included as section 28(b). After the Statehood Bill finally passed, section 28(b) removed all references to the Territory of Alaska in section 35 in favor of references to the State of Alaska. *See* 30 U.S.C. § 191 (1964).[13] The effect of

---

12. Prior to recent amendments, section 35 was silent as to whether the amounts were to be taken from gross or net proceeds. In practice, Alaska received 90 percent of the gross proceeds from oil and gas leases on federal lands located within Alaska from 1958 until 1990. The 10 percent withheld by the Federal Government was understood to cover the costs of administering the MLA. H.R.Rep. No. 624, 85th Cong., 1st Sess.

23 (1957) U.S.Code Cong. & Admin.News 1958, p. 2940 (stating, "[T]he remaining 10 percent is retained by the Federal Government for administration purposes.").

13. The MLA has been amended several times since 1958 and currently reads in relevant part:

(a) All money received from sales, bonuses, royalties including interest charges collected

section 28(b), therefore, was to give the State, rather than the Territory, the right to 90 percent of mineral royalties. The substantive change in allocation had already occurred as a result of P.L. 85–88.

*The Statehood Act*

In its final form, the Alaska Statehood Act consists of 30 sections. 48 U.S.C. *note prec.* § 21 (1994), 72 Stat. 339 (1958). Many of these are administrative or transitional in nature or otherwise have no bearing on the present controversy. The relevant sections are as follows:

*Section 2* deals with the territory of the new State. It provides:

> The State of Alaska shall consist of all the territory, together with the territorial waters appurtenant thereto, now included in the Territory of Alaska.

*Section 4* states in relevant part:

> As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its

political subdivisions by or under the authority of this Act

. . . .

*Section 5* governs title to property:

> The State of Alaska and its political subdivisions respectively, shall have and retain title to all property, real and personal, title to which is in the Territory of Alaska or any of the subdivisions. Except as provided in section 6 hereof, the United States shall retain title to all property, real and personal, to which it has title, including public lands.

*Section 6*, among other things, allows the State to choose 103,350,000 acres of federal land. The section also contains many of the other property grants including the granting of certain real property in Alaska upon which government buildings are located, and the grants of seventy percent of the revenues from the Pribilof seal harvests and five percent of the proceeds from the sale of public land in Alaska.

*Section 8* provides that Alaska will only become a State if a majority of the people of

---

under the Federal Oil and Gas Royalty Management Act of 1982, and rentals of the public lands under the provisions of this chapter and the Geothermal Steam Act of 1970, notwithstanding the provisions of section 20 thereof, shall be paid into the Treasury of the United States; and, subject to the provisions of subsection (b) of this section, 50 per centum thereof shall be paid by the Secretary of the Treasury to the State other than Alaska within the boundaries of which the leased lands or deposits are or were located; said moneys paid to any of such States on or after January 1, 1976, to be used by such State and its subdivisions, as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this chapter, for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service; and excepting those from Alaska, 40 per centum thereof shall be paid into, reserved, appropriated, as part of the reclamation fund created by the Act of Congress known as the Reclamation Act, approved June 17, 1902, and of those from Alaska, 90 per centum thereof shall be paid to the State of Alaska for disposition by the legislature thereof: . . . .
(b)(1) In calculating the amount to be paid to States during any fiscal year under this section or under any other provision of law requiring payment to a State of any revenues derived

from the leasing of any onshore lands or interest in land owned by the United States for the production of the same types of minerals leasable under this chapter or of geothermal steam, 50 percent of the portion of the enacted appropriation of the Department of the Interior and any other agency during the preceding fiscal year allocable to the administration of all laws providing for the leasing of any onshore lands or interest in land owned by the United States for the production of the same types of minerals leasable under this chapter or of geothermal steam, and to enforcement of such laws, shall be deducted from the receipts derived under those laws in approximately equal amounts each month (subject to paragraph (4)) prior to the division and distribution of such receipts between the States and the United States.
. . . .
30 U.S.C. § 191 (1994). Subsection (b), which was not added until 1993, divides the cost of administering the MLA between the Federal Government and the States. Prior to that time, the Federal Government alone was responsible for paying the administrative costs of the MLA. The 1988 version of Section 191 ended with the following sentence: "In determining the amount of payments to States under this section the amount of such payments shall not be reduced by any administrative or other costs incurred by the United States." 30 U.S.C. § 191 (1988).

Alaska vote affirmatively on the following three propositions:

(1) Shall Alaska immediately be admitted into the Union as a State?

(2) The boundaries of the State of Alaska shall be as prescribed in the Act of Congress approved (date of approval of this Act) and all claims of this State to any areas of land or sea outside the boundaries so prescribed are hereby irrevocably relinquished to the United States.

(3) All provisions of the Act of Congress approved (date of approval of this Act) reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people.

*Section 28(b),* the section which the State alleges in count V was breached by the Federal Government, amends the MLA as discussed above.[14]

### The Ratification Debate

Alaska could not be certified by the President as a State unless there were affirmative votes on the three questions posed in section 8 of the Statehood Act. Those questions are quoted above. In its argument as to the meaning of the Statehood Act, plaintiff draws from the public debate surrounding the plebiscite. Specifically, the State focuses on the third proposition, which it feels placed the main provisions of the Statehood Act before the people of Alaska. By putting question three on the ballot, and asking the citizens to approve the "grants of land and other property," the State asserts that Congress agreed to be bound by section 28(b), which the State views as a grant of "other property."

The State particularly relies on the statements of Secretary of the Interior Fred A. Seaton, a major proponent of statehood, who gave numerous speeches in support of state-

hood, and, in the process, gave his views on what statehood would mean for Alaska.

During a speech before the Anchorage Chamber of Commerce on August 26, 1958, Secretary Seaton explained the third proposition:

Now let's turn to proposition three: "All provisions of the Act of Congress approved July 7, 1958, reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people."

A "yes" on this one means principally two things. It means that the voter approves of granting the President power to create special withdrawals, mainly in northern and western Alaska, in the interest of national defense.

. . . .

A "yes" on proposition three also means, that the voter approves of the State's selecting from federally owned public lands approximately 103 million acres over a 25 year period. This is the most generous amount of land ever given to a State before admission into the Union.

There, in brief, are the three propositions. Not one is complicated. Not one is unique to Alaska, except for the generosity of the Federal land grant to the new State. Not one curtails any of the rights and privileges which Alaskans now have.

Alaska App. 27 at 2,[15] Address by Secretary of the Interior Fred A. Seaton to the Chamber of Commerce, Anchorage, Alaska (Aug. 25, 1958) (the "Anchorage Address").

During an earlier speech on August 23, 1958, at the dedication of the Wickersham Monument in Fairbanks, Secretary Seaton also discussed the meaning of proposition three:

---

**14.** The parallel provision, section 28(a), amended 48 U.S.C. § 439 (1952) to give Alaska 90 percent of the *net* profits from the coal mining operations on government lands. Section 439 was first amended by P.L. 85–88 using similar language to that used in 28(a) so as to give the Territory of Alaska 90 percent of the *net* profits from coal mining. Section 439 was subsequently repealed in 1959 by Pub.L. No. 86–252, 73 Stat. 490 (1959).

**15.** "Alaska App." refers to the appendix filed by plaintiff, State of Alaska, along with its Motion for Partial Summary Judgment, on November 30, 1994.

In the third proposition, the key question is this: "Do you approve granting the President power, if necessary, to make special national defense withdrawals within the State?" This power to be granted to the President is no greater than that already freely given in twenty-five States. It is essential to the national defense. It provides for the continuance of state law and for the right of the individual within any area which may possibly be withdrawn.

Alaska App. 26 at 2, Address by Secretary of Interior Fred A. Seaton at the Dedication of the Wickersham Monument, Fairbanks, Alaska (Aug. 23, 1958) (the "Fairbanks Address"). In addition to these general statements, Secretary Seaton also described section 28(b). He stated that under the Statehood Act "the State gets 90 percent of all bonuses, royalties, and rentals for mineral leasing on Federal lands." Alaska App. 26 at 3. He iterated this proposition during the speech before the Anchorage Chamber of Commerce two days later when he stated, "the [Statehood] Act reaffirms Alaska's preferential treatment in receiving 90 percent of all revenues from oil, gas, and coal leasing on the public domain." Alaska App. 27 at 4.

The people of the Territory overwhelmingly voted in favor of Statehood, answering all three propositions in the affirmative. President Eisenhower proclaimed Alaska a State on January 3, 1959. Proclamation. No. 3269, 73 Stat. c16 (Jan. 3, 1959).

*Development of the Current Dispute*

*Diminishing oil revenues*

Between 1958 and 1966 the Federal Government offered approximately 18.8 million acres of federal land in Alaska for oil and gas leasing and Alaska received 90 percent of the revenues from those leases. While these revenues have been substantial, the receipts have been less than those received by some other States from federal mineral leasing. Since 1966, however, the number of leases issued has been drastically reduced. Some additional federal lands have been opened up for leasing but these have been unsubstantial. *See* Merrill Aff. at 1–2.[16]

By far most of Alaska's oil revenues have come from State-owned lands, particularly from the huge Prudhoe Bay field on the North Slope. Oil from the North Slope is marketable because of the construction of the Trans–Alaska Pipeline ("TAPS"), which moves oil from Prudhoe Bay to the year-round port at Valdez. It is estimated, however, that 74 percent of the Prudhoe Bay recoverable reserves have been produced. Production from the North Slope started declining before 1990. TAPS currently has a surplus capacity of about 600,000 barrels of oil per day.

One of the most promising potential areas for future oil and gas exploration lies within the 1.5 million acre coastal plain of ANWR.[17] The lands in ANWR were temporarily withdrawn from mineral leasing in 1981, however, by the Alaska National Interest Lands Conservation Act ("ANILCA").[18] ANILCA called for a moratorium on leasing so that the oil and gas potential of ANWR could be determined. It directed the Department of the Interior "to engage in a comprehensive study of the area over at least 5 years, . . . and then report back to Congress on the nature of those findings so Congress would be in a position to make a fully informed decision regarding the management of this particular area." *Arctic National Wildlife Refuge (ANWR): Oversight Hearings Before the Subcommittee on Water and Power Resources of the House Committee on Interior and Insular Affairs*, 100th Cong., 1st Sess. Part I at 8 (Apr. 30, 1987) (Testimony of William Horn, Asst. Secretary of Interior for Fish and Wildlife and Parks).

In April of 1987, the Secretary submitted the required reports and recommendations to Congress. Alaska Supp.App. 15, *Arctic Na-*

---

16. Robert Merrill is a staff land law examiner in the Division of Lands, Minerals and Resources in the Alaska State Office of the Bureau of Land Management, U.S. Department of the Interior.

17. ANWR in its entirety consists of 19 million acres.

18. Pub.L. No. 96–487, 94 Stat. 2371 (Dec. 2, 1980). The 1.5 million acre coastal plain of ANWR was designated for withdrawal and study under section 1002 of ANILCA and, therefore, is often referred to as the "1002 area."

*tional Wildlife Refuge, Alaska, Coastal Plain Resource Assessment.* The Secretary recommended that the entire ANWR coastal plain be made available for oil and gas leasing. *Id.* at 3. He followed this recommendation with the statement: "Although the entire area should be considered for leasing, only a percentage would actually be leased, an even smaller percentage would be explored, and—if oil is discovered—a still smaller percentage would be developed." *Id.* at 3. In response to this recommendation, Congress, over several years, conducted numerous hearings on the issue, but, since 1991, there has been no Congressional action on the future of ANWR. *See* 138 CONG.REC. S822–06 (Feb. 3, 1992).[19]

Purely from the standpoint of national oil and gas policy, the State makes a compelling argument that not opening up a part of ANWR will jeopardize any use of TAPS after the year 2009. Therefore, although the court does not view the issue as directly bearing on the construction of the Statehood Act, it will assume for purposes of ruling on the motion that logic and the national interest dictate that TAPS should be more fully utilized by opening up portions of ANWR to oil exploration. As stated in the affidavit of James E. Eason, until 1995, Director of the State of Alaska's Division of Oil and Gas, "The long term stability of Alaska's economy is dependent upon the systematic exploitation of Alaska's oil and gas resources." Eason Aff. at 14, ¶ 28. Because of the long lead time involved in leasing, exploration, production and delivery, the State contends that the time to open up new fields, particularly within ANWR, is now.

In counts I through IV of its complaint, the State alleges that there is an implied promise within section 28(b) that the Federal Government will administer its lands within Alaska in such a way that they are productive of revenues for the State. In response

to the defendant's assertion of a statute of limitations defense, the State has taken the position that the breach of this implied promise occurred when Congress refused since 1987 to act affirmatively on the Secretary's recommendation to open up a portion of ANWR for leasing. The viability of these allegations are put at issue by the Federal Government's motion for summary judgment.

*The Change from Net to Gross Proceeds*

From 1920 until 1991, the states or territories received 90 percent of *gross* mineral leasing revenues. It was understood that the ten percent kept by the Treasury paid for the administrative expenses of the Federal Government.[20] Beginning in fiscal year 1991, however, through Department of Interior appropriations, Congress began to deduct the Department of Interior's costs for administering the MLA, prior to the calculation of amounts to be distributed to the States, thus calculating the states' share of proceeds on 90 percent of the net amount of revenues collected. Pub.L. No. 101–512, 104 Stat. 1915, 1926 (1990) (providing for the deduction of $68,200,000 from "Federal onshore mineral leasing receipts prior to the division and distribution of such receipts between the States and the Treasury …"). Similar provisions were made in the appropriations for fiscal years ending in 1992,[21] and 1993.[22]

In 1993, Congress amended section 191 of the MLA, inserting language directing that the costs of administering the mineral leasing program would be divided among the several States and the Federal Government. Pub.L. No. 103–66, § 10201(2), 107 Stat. 407 (1993). As a result, the Minerals Management Service, the agency within the Department of the Interior charged with administering mineral leases, began deducting administrative expenses from Alaska's mineral royalty re-

---

19. *See* Alaska Supp.App. 24 at 2, *CRS Report for Congress: Arctic National Wildlife Refuge; Congressional Consideration Since the 99th Congress,* 2 (April 5, 1991) ("In the 99th and later Congresses, dozens of bills have been introduced and over 25 days of hearings have been held.").

20. H.R.REP. No. 624, 85th Cong., 1st Sess. 23 (1957).

21. Pub.L. No. 102–154, 105 Stat. 990, 1001 (1991) ($68,200,000 deduction).

22. Pub.L. No. 102–381, 106 Stat. 1374, 1385 (1992) ($76,850,000 deduction).

ceipts. Strickland Aff. ¶ 4.[23] A total of $2,330,456.15 has been deducted from Alaska's receipts for administrative costs from November 1990 through October 1994. Strickland Aff. ¶ 10.

In count V of its complaint, Alaska alleges that the formula for distribution of revenues in place at the time of statehood, namely, 90 percent of gross as opposed to net receipts, could not be altered with respect to Alaska. Unlike the situation with other states, it contends that that method of allocation was included in section 28(b) of its Statehood Act and, therefore, constitutes a binding contractual obligation of the Federal Government. It follows, according to the State, that the legislative change requiring that the State's share of revenues be based on gross instead of net receipts constituted a violation of that contract.

## DISCUSSION

In its motion, the State asks the court to determine that the Statehood Act is a contractually binding agreement, and, specifically, that section 28(b) constitutes an enforceable term of that contract. Assuming that it is, the State then asks the court to construe the section to contain the following promises by the Federal Government: 1) that Alaska would, for all time, receive 90 percent of *gross* revenues from royalty payments on mineral leases on lands within Alaska; and, 2) that along with that promise, the United States assumed the burden to develop and lease the federal mineral estates in Alaska. The State has moved for summary judgment only on the first alleged breach of promise.

Both promises, however, along with the taking claim stated in count IV, are put in issue by the Federal Government's motion. Although the motion raises a number of de-

**23.** Ms. Strickland is an accountant in the Royalty Accounting Section, Division of Oil and Gas, Alaska Department of Natural Resources.

**24.** The Federal Government also contends that count IV must be dismissed, because, if there is no contract right as alleged, then there is no property that could have been taken. Furthermore, the Government contends that all five counts are untimely brought.

**25.** Some technical or housekeeping provisions no doubt were understood to be alterable. For

fenses, two are key. The first is that section 28(b) is not an enforceable provision. The second is that, even if section 28(b) constituted an enforceable portion of the Statehood Act, that section does not include either a promise to grant Alaska ninety percent of gross mineral leasing revenues or a promise to actively develop mineral leasing on federal lands.[24]

The Supreme Court has not utilized a strict taxonomy in dealing with the interpretation of statehood acts. Such enactments have been construed to partake of the character of contracts in some respects, and in other respects the character of normal legislation. *See Oklahoma v. New Mexico,* 501 U.S. 221, 235 n. 5, 111 S.Ct. 2281, 2289 n. 5, 115 L.Ed.2d 207 (1991). Plainly the Court has taken the view that they can be drafted in such a way as to make particular provisions binding and unalterable. *Andrus v. Utah,* 446 U.S. 500, 507, 100 S.Ct. 1803, 1807, 64 L.Ed.2d 458 (1979) (land grant in Statehood Act was a " 'solemn agreement' which in some ways may be analogized to a contract between private parties."); *United States v. Morrison,* 240 U.S. 192, 201, 36 S.Ct. 326, 329, 60 L.Ed. 599 (1915) (land grant provision of Statehood Act was a compact); *Stearns v. Minnesota,* 179 U.S. 223, 244, 21 S.Ct. 73, 81, 45 L.Ed. 162 (1900) ("[The] provisions of the enabling act and the constitution, in form at least, made a compact between the United States and the State....."). Other provisions have been treated as routine legislation, however.[25] *Alaska v. Andrus,* 429 F.Supp. 958 (D.Alaska 1977) (holding that section 6(e) of the Statehood Act which gives Alaska control of wildlife in Alaska must give way to a subsequent federal statute relating to management of wildlife on federal lands), *aff'd,* 591 F.2d 537 (9th Cir.1979).

example, section 12(b) of the Statehood Act states: "Alaska constitutes one judicial district. Court shall be held at Anchorage, Fairbanks, Juneau, and Nome." Since the passage of the Statehood Act, the population of Alaska has increased and the District Court of Alaska now sits in Ketchikan as well. *See* 28 U.S.C. § 81A (1994) (as amended by Pub.L. No. 86–70, 73 Stat. 147 (1959)). Presumably Congress could also create a second judicial district as well.

Although the State asks the court to rule that the entire Statehood Act is a binding contract, it is unnecessary for the court to resolve that issue. Because parts of a statehood compact can be binding, and because the State's case rests on Section 28(b), it is enough to consider the legal effects of that provision.

The Federal Government argues that section 28(b) was merely a technical amendment, designed to avoid any argument that the new State would not receive the benefit of P.L. 85–88. It follows, according to defendant, that section 28(b) was not intended to bind the Federal Government in perpetuity to a particular version of the MLA. To support this contention, defendant points to the Senate Committee Report addressing the various sections of the Statehood Act. That report grouped section 28(b) [26] under "Miscellaneous Provisions" and more particularly described it as:

> [A]n amendment adopted by the committee for the purpose of authorizing payment to Alaska of 90 percent of the proceeds derived in Alaska under the Mineral Leasing Act and the Alaska Coal Leasing Act. This merely applies the provisions of ... [P.L. 85–88] ... to the State of Alaska, whereas it presently applies to the Territory.

S.REP. No. 1163, 85th Cong., 1st Sess. 29 (1957).[27]

The Federal Government also points to a statement of Representative O'Brien of New York, a supporter of statehood. In response to the contention that the land grant provisions were excessive, particularly because mineral rights were not retained by the Federal Government, O'Brien pointed out that "[i]f there is a give away [of land or other property to the State of Alaska], with which I do not agree, it is already taking place because 90 percent of the revenue that the Federal Government presently collects from mineral leases in Alaska is turned back to the Territory of Alaska [by way of P.L. 85–88]." 104 CONG.REC. 9219 (1958); *see also* 104 CONG.REC. 9341 (1958) (Representative Saylor arguing that the 90 percent is not an incentive since the Territory was already receiving that amount); *Id.* at 9498 (same). The point of this reference, according to the Government, is that oil revenue sharing was already occurring and could not, therefore, have played much of a role in the ultimate ratification of statehood. As such, it contends that section 28(b) could not have been part of any specific agreement between the parties. Defendant further argues that Secretary Seaton's statements during two speeches just prior to the plebiscite are not entitled to any interpretive weight in construing section 28, and that, in any event, he made no specific promises to the voters beyond those in the Statehood Act.

The State views the same facts and sees a contract. It contends that section 28(b) was essential to the future well being of the fledgling State and that its inclusion in the Statehood Act was instrumental in the passage of the Act and the vote in favor of statehood by the people of Alaska. Accordingly, it should be construed as fixed in its 1958 form. The State directs the court to other points in the legislative history to support its position that section 28(b) was more than a mere technical amendment. The House Committee Report accompanying the 1958 Statehood Bill listed section 28(b) under the heading "Major Provisions of the Bill." H.R.REP. No. 624, 85th Cong., 1st Sess. 3 (1957). The House Report also listed the section when describing ways to counter the impact of the high percentage

---

**26.** In this report Section 28 is labeled as Section 22.

**27.** Statements by other Congressmen suggest that they viewed the section as a technical amendment to make up for Alaska's exclusion from the Reclamation Act. *See* 104 CONG.REC. 9361 (1958) (Statement of Sen. Dawson of Utah) ("Additionally, Alaska would receive 90 percent of the proceeds from the operation of Government coal mines and from the production of coal, phosphates, oil, oil shale, and sodium from the public domain. Reflecting Alaska's exclusion from the Reclamation Act of 1902, these are the same provisions which this Congress approved—by consent—for the Territory of Alaska last year in Public Law 85–88."); S.REP. No. 1163, 85th Cong., 1st Sess. 3 (1957) ("Section [28] of the bill extends to the State the provisions of Public Law [85–88 approved earlier this year].... Without section [28] in the bill, the new State would not be within the purview of the 1957 act."); *see also* H.R.REP. No. 624, 85th Cong., 1st Sess. 23 (1957).

of federal withdrawals in Alaska. H.R.REP. No. 624, 85th Cong., 1st Sess. 8 (1957). It is the State's position that section 28(b) was a necessary component to achieving ratification. Concerns regarding the State's financial stability were so acute, it contends, that treating section 28(b) as changeable would constitute a breach of faith with the people of the State. It sees, moreover, in the statehood debate and related events, particularly the language of question three of the plebiscite and Secretary Seaton's statements interpreting this question, as a representation by the Federal Government that section 28(b) would not be altered.

The State points out that question three of the plebiscite asked Alaskan voters to agree to the grants of land or other property made in the Statehood Act. It contends that the grant of an unalterable 90 percent share of mineral leasing revenues constitutes a grant of "other property" and as such, was voted on by the people of Alaska. As the Federal Government points out, however, the Senate report accompanying the Statehood Bill suggests the contrary. Under the discussion heading, "Grants of Land and Other Property," only the grants made in section 6 are discussed, specifically the direct grants of land and buildings including the 103,350,000 acres, certain real and personal property used to conserve and protect Alaskan fisheries and wildlife, the Pribilof Island Seal royalties, the grant of five percent of the revenue generated by the sale of public lands in Alaska, granting the State 12½ percent more of the revenues from national forests for a period of ten years,[28] as well as various other minor land grants and procedures governing land grants. S.REP. No. 1163, 85th Cong., 1st Sess. 16–21 (1957). Section 28(b) is not mentioned under this heading.

There are obvious flaws in both parties' positions. The State, for its part, does not give adequate consideration to the implications of the differences wrought by the legislative character of the entire Statehood Act. In addition, Alaska has overstated the importance of the revenue sharing provision. It was not viewed as the key component of financial viability for the State. Of the various sources of future income, the most important source was seen as the land grant. Among the other sources, revenue sharing under section 28(b) was not prominent. For example, when reciting sources of revenue to offset the costs of statehood, Representative Pfost of Idaho listed four: the "first" that came to her mind was the 70 percent of proceeds from the Pribilof Islands seal fisheries.[29] 104 CONG.REC. 9511 (1958). "Next" was income from fish and wildlife licenses. *Id.* The recent grant of 90 percent of gross revenues from mineral leasing was third on her list. *Id.* Fourth was receipts from timber sales. *Id.* Senator Kuchel of California addressed the financial provisions in the same order of precedence as did Pfost, i.e., placing revenue sharing third in his list. Moreover, the substance of section 28(b) was already in place for the Territory. *See* P.L. 85–88. Statehood would not have affected the amount of revenues. There is also reason to think that some of the special revenue provisions were viewed as a way to provide income primarily during the early years of statehood, as a bridge until state lands became productive.[30]

The court is equally unwilling, however, to accept without reservation defendant's contention that section 28(b) was not a substantive part of the compact. It was plainly viewed as one component in an effort to ensure that Alaska was financially viable. As

---

**28.** Congress specifically retained the power to change this provision. S.REP. No. 1163, 85th Cong., 1st Sess. 17 (1957).

**29.** The House Report states that revenues from the Pribilof Islands would be "of material help to Alaska in meeting the anticipated greater costs of statehood." H.R.REP. No. 624, 85th Cong., 1st Sess. 8 (1958). Secretary Seaton estimated that those revenues would be the state's second largest source of new revenues behind the land grants. 104 CONG.REC. 12,208 (1958).

**30.** There were a number of special financial provisions in both the Statehood and Omnibus Acts that were meant to temporarily help the new state. *See* S.REP. No. 1163, 85th Cong., 1st Sess. 17 (1957) (subsection 6(g) of the Statehood Act grants the new State, for only 10 years, an additional 12½ percent of the money received from national forests in Alaska); S.REP. No. 1028, 83d Cong., 2d Sess. 8–12 (1954) (discussing the costs of statehood and ways to counter them through various programs and incentives).

stated in the House Report, "Some of the additional costs connected with statehood will be met by granting the State a reasonable return from Federal exploitation of resources within the new State." S.REP. No. 1163, 85th Cong., 1st Sess. 3 (1957). Without section 28(b), no provision of the Statehood Act automatically would have substituted the State for the Territory in terms of revenue sharing. The fact that such an omission could have been cleaned up in the Alaska Omnibus Act [31] passed the following year does not mean that the provision was not substantive. It clearly was part of a group of provisions that, together, ensured the financial viability of Alaska.

Ultimately, the subject matter of the Statehood Act—entry into a union of states—is *sui generis* and cannot be strictly compressed into a contractual or legislative mold. It is neither a garden variety contract or routine legislation. The statehood debate cannot be analogized to the normal negotiations between parties to commercial contracts. The Act was not negotiated in the same way as a normal contract. There were not two distinct parties. The plebiscite on statehood and the debate on the pros and cons of statehood concerned what was fundamentally a political issue.

In the final analysis, however, it is unnecessary to decide with exactitude whether Section 28(b) should be construed as a binding contract or as mere legislation. The court is prepared to assume, along with the State, that Section 28(b) is a contractually enforceable provision of the Statehood Act. The real question then becomes, what does Section 28(b) mean? Even if the provision is "unalterable," if it does not contain the promises alleged by the State, the Federal Government still prevails. In determining the

meaning of Section 28(b), the court further is prepared to consider all the legislative and other materials put forward by the State. *What Obligations Did the United States Incur in the Statehood Act?*

■ In determining whether Section 28(b) contains either of the specific implied promises alleged by the State, the beginning point for analysis is the express language of the provision.[32] By its terms, that section had the limited effect of substituting the State for the Territory in section 35 of the MLA. Thereafter, in practice, Alaska received 90 percent of gross mineral leasing revenues, *under* the MLA. The most straight forward reading of the section, even in light of its historical context, is as a device merely to put Alaska in the same position as other States. S.REP. No. 1163, 85th Cong., 1st Sess. 4 (1957). Neither the Statehood Act or the MLA specifically require the Secretary to lease mineral deposits [33] nor does the Statehood Act specifically promise that royalties will always be calculated in the same way. The net effect of P.L. 85–88 and section 28(b) is that Alaska is simply plugged into the MLA, *along with the other States.* If this is correct, as the court believes, Congress has the power to amend the MLA to change the distribution formula and whatever changes Congress makes to it will affect all states, including Alaska. Section 28(b) would be unaffected by such changes, although revenues might be calculated in a different way.

The State contends, however, that the real meaning of Section 28(b) can only be derived by a much broader consideration of all the circumstances surrounding passage of the Statehood Act and the subsequent plebescite. Before considering whether that evidence supports either of the two promises alleged,

---

**31.** 48 U.S.C. *note prec.* § 21 (1994), Pub.L. No. 86–70 (June 25, 1959), 73 Stat. 141 (1959).

**32.** The Supreme Court, in interpreting the Utah Enabling Act, stated that the express language of an act is conclusive of Congress' intent upon the point. *United States v. Sweet,* 245 U.S. 563, 567, 38 S.Ct. 193, 193, 62 L.Ed. 473 (1917). An exception to this would be if the "application of the words of the [statute] according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories."

*Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (interpreting the United States—Japan Friendship, Commerce and Navigation Treaty) (citations omitted).

**33.** The MLA has been construed to give the Secretary complete discretion regarding whether or not to lease certain lands. *Haley v. Seaton,* 281 F.2d 620, 625 (D.C.Cir.1960). It contains no mandate to lease. *Id.*

however, the court will address, because of its importance to the State's argument, an issue common to both—namely, the impact of Secretary Seaton's statements.

Apparently Secretary Seaton barnstormed the Territory in the weeks before the plebescite urging ratification. The State cites his comments that oil was recently discovered in the Kenai peninsula, that Alaska would get 90 percent of mineral leasing revenues,[34] and that the federal government would "spur on" mineral leasing. Alaska App. 26 at 3–4. The State also points to his promises to open up parts of ANWR to leasing. Alaska App. 26 at 3; *see* Notice of Proposed Withdrawal and Reservation of Lands, 23 Fed.Reg. 364 (1958). These promises, according to the State, induced Alaskans into voting for Statehood under the mistaken belief that the Federal Government would actively manage federal lands in Alaska in a way that would maximize revenues from mineral resources.

Without suggesting that his statements were insincere, the court concludes that the State gives unwarranted weight to Secretary Seaton's comments. There is nothing in his statements specifically promising that Alaska would receive 90 percent of mineral leasing revenues in perpetuity or that the Federal Government would actively develop ANWR or other areas for leasing. His statements were general in nature and amounted to salesmanship. They are Seaton's enthusiastic projections of the future. Clearly not everyone in Congress was persuaded of the reliability of his representations. Senator Thurmond, during floor debate, took note of the Secretary's comments and urged his lis-

teners to give "close scrutiny" to his "glowing pictures." 104 Cong.Rec. 12,054 (1958).

Even if the Secretary's comments are elevated to the status of contract negotiations or legislative history, they were plainly not meant as literal promises or statutory construction. They could not be relied upon uncritically. The Secretary of Interior was not specially delegated by Congress either to negotiate or to interpret what it had done. While his promises or interpretations serve as part of the overall factual background, they were not spoken *ex cathedra.* Nor could he commit future Secretaries of the Interior to maintain particular policy initiatives.

Discipline must be imposed in determining the nature of the Federal Government's obligations to Alaska. They must have an anchor in written words adopted by Congress and ratified by the people of Alaska. For that reason, the Secretary's words are entitled to substantially less weight than the Act itself, and any consistent treatment given it in the legislative history.[35]

### The Ninety Percent Provision

Alaska argues that section 28(b) requires the Federal Government to pay 90 percent of the gross revenues of mineral leasing to Alaska, not 90 percent of the net proceeds. It points out that section 28(a) of the Statehood Act refers to "[a]ll net profits from operation of Government coal mines ..." while section 28(b) states: "[a]ll money received from sales, bonuses, royalties, and rentals of public lands under the provisions

---

**34.** During a speech in Anchorage on August 25, 1958, the Secretary stated:

> [T]he [Statehood] Act reaffirms Alaska's preferential treatment in receiving 90 percent of all revenues from oil, gas and coal leasing on the public domain....
>
> ... [A]ccording to an analysis prepared in the Department of the Interior, the additional costs of State Government will be more than offset by the additional revenues made available to Alaska.

Alaska App. 27 at 4–5.

During a speech at Fairbanks on August 23, 1958, he stated: "Since early this year the Territory has received 90 percent of all oil lease

revenues; the State of Alaska will continue to do so." Alaska App. 26 at 3.

**35.** The court notes that *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), relied on by plaintiff, does state "Section 4 [of the Statehood Act] must be construed in light of the circumstances of its formulation and enactment." *Id.* at 65, 82 S.Ct. at 565 (citing *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 87, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918)). The "circumstances" relied on in *Kake Village,* however, were primarily legislative history. Similarly, as *Alaska Pacific Fisheries,* stated, "[t]he question is one of construction—of what *Congress* intended...." *Alaska Pac. Fisheries,* 248 U.S. at 87, 39 S.Ct. at 41 (emphasis added).

of this Act...." The State argues that Congress could have, but did not, limit Alaska's share of oil and gas revenues to 90 percent of "net" revenues. Instead it provided that Alaska was entitled to 90 percent of "all money received," without deduction for administrative costs. Presumably Congress knew what it was doing in using "net" in section 28(a) but not so limiting section 28(b). As the Supreme Court has recognized: "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citation omitted).

■ The question posed is whether Alaska, unique among the States, was given an enforceable right to insist, in perpetuity, on the particular legislative scheme then extant. Plainly it is possible for Congress to make such a promise. *See Winstar Corp., et al. v. United States,* 64 F.3d 1531 (Fed.Cir.1995) (*en banc*), *cert. granted,* —— U.S. ——, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996) (No. 95–865). But a promise not to alter legislation is one that should not be lightly inferred into a contract. *See Trapper Mining Inc. v. Lujan,* 923 F.2d 774, 778 (10th Cir.) ("Congress is entitled to modify ... contracts through subsequent legislation unless the right is 'surrendered in unmistakable terms' ... The Supreme Court has repeatedly warned that interpretations of contracts which would immunize them from the sovereign power of the United States to change its laws should be avoided if possible.") (citing *Bowen v. Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986)), *cert. denied,* 502 U.S. 821, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991).

The State's best evidence is a statement made by Senator Robertson during a debate on the 1958 Statehood Bill and a statement in the Senate Report that accompanied the 1958 bill. In the floor debate, Senator Robertson stated, "Last year, Congress, in anticipation of statehood, and in lieu of participation in the Federal reclamation program, awarded Alaska 90 percent of *gross receipts* from the

oil, gas, and coal leases on the public domain." 104 CONG.REC. 12,032 (1958) (emphasis added). The Senate Report included the statement, "Section 2[8] ... authorize[s] payment to Alaska of 90 percent of the proceeds derived in Alaska under the Mineral Leasing Act...." S.REP. NO. 1163, 85th Cong., 1st Sess. 29 (1957).

The difficulty with the State's references is that they reflect only what Congress undisputably did through section 28. It gave Alaska 90 percent of net revenues from federal coal mines in Alaska, and, like other states, 90 percent of gross revenues from other mineral lands. This 90 percent of gross revenues from other mineral lands amounted to 37½ percent by way of the MLA and the additional 52½ percent originally granted in P.L. 85–88. Statements describing the immediate effect of section 28(b) thus are not dispositive. Alaska was simply introduced into a pre-existing legislative scheme, one of the effects of which was to entitle it, at that time, to 90 percent of gross receipts. Section 28(a) plugged Alaska into 48 U.S.C. § 439 (1952), which already used the phrase "net" in granting the Territory of Alaska a share of coal revenues from federal coal mining operations in Alaska. Section 28(b), on the other hand, plugged Alaska into 30 U.S.C. § 191, which was then calculated based on gross receipts. The use of the term "net" in section 28(a) thus loses much of its significance.

The State's reliance on evidence of the importance of section 28(b) to solving the financial instability problem are thus diminished in consequence. Revenue sharing would still aid the State financially, even if it was assumed that Alaska's share would be calculated in the same way as other states'. While it is true that the inclusion of revenue sharing provisions was an important part of the mix of provisions necessary to address concerns about how the new State would be financed, it is also inescapable that there were no expectations or intent that Alaska's position would be privileged as against other States, at least in this respect. In fact, the opposite is true. Most telling in this respect is the statement in the House Report, that "The financial measures of the bill certainly

provide no more than a measure of Federal cooperation in Alaska's new venture. The bill does not grant any advantage over existing States." S.REP. No. 1163, 85th Cong., 1st Sess. 4 (1957). Yet an advantage is precisely what Alaska would get if its insertion into the MLA carried with it an exemption from subsequent changes to the MLA. Therefore, the court holds there was no promise on the part of the Federal Government to pay Alaska, in perpetuity, 90 percent of gross mineral leasing revenues from federal mineral leases in Alaska. Accordingly, summary judgment for defendant on count V is appropriate.

### Implied Duty to Develop

■ It next must be determined if the revenue sharing provision in section 28(b) carried with it an implied duty to develop and manage Federal mineral lands in such a way as to maximize the amount of revenue Alaska would receive. To establish this implied duty the State attempts to go beyond the express terms of section 28(b), and weave together principles of contract and oil and gas law. The State begins with the obligation, implied into every contract, that both parties will act in good faith and observe reasonable commercial standards of fair dealing in performing the contract. Restatement (Second) Contracts § 205. According to the State, this specifically means that the Federal Government agreed not to interfere with Alaska's reasonable expectations of a return on federal mineral lands. The duty of good faith and fair dealing, although implied, is a real obligation. Nevertheless, it is inadequate to the State's purpose here. The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties. In the present case, however, Alaska would have the implied duty of good faith and fair dealing create by implication an express obli-

gation to open up specific federal lands to generate additional revenue for the State. There is no such express substantive obligation in section 28(b).

■ The State next points to oil and gas law to support an obligation to lease. It suggests that the grant to the State of a right to MLA revenues creates, in effect, a non-participating royalty interest.[36] This interest, in turn, carries with it an implied duty to develop the mineral estate for the benefit of the royalty holder. Alaska points to several cases decided in other jurisdictions that impose on land owners a duty to develop the mineral estate when another party holds a non-participating royalty interest in the mineral estate. See, e.g., Welles v. Berry, 434 So.2d 982 (Fla.1983); J.M. Huber Corp. v. Square Enters., Inc., 645 S.W.2d 410, 414 (Tenn.1982).

In order to give some definition to the duty created, Alaska points to a decision by the Court of Claims in Federal Land Bank of Houston v. United States, 144 Ct.Cl. 173, 168 F.Supp. 788 (1958), which has become something of a landmark in the field. The facts there were that the original landowners transferred the land to a third party, but reserved a fractional non-participating royalty interest. The fee eventually came to be owned by the United States, subject to the plaintiff's royalty interest. The royalty interest was of limited duration. Before it expired, oil or gas wells were drilled on adjacent property. The effect of those wells would have been to drain oil and gas from the property in question, if similar wells were not installed. Leases were executed on the subject property and producing oil and gas wells were installed. The wells came on line, however, after plaintiff's royalty interest expired. The court found that the Federal Government had delayed unduly in develop-

---

**36.** A non-participating royalty interest and the rights related to the interest were discussed in *Welles v. Berry*, 434 So.2d 982 (Fla.1983). The court stated:

> A nonparticipating royalty is defined as an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals

to accrue under oil, gas, or mineral leases executed by the owner of the mineral fee estate. The exclusive leasing privilege which remains in the mineral fee owner is commonly referred to as the executive right. Nonparticipating royalty interests may be created by a grant or reservation, either prior or subsequent to a lease of the land for oil and gas purposes. *Id.* at 984 (citations omitted).

ing the wells to the plaintiff's injury, and in such a way that the United States benefitted from the delay. It stated the general rule to be, "as between the mineral fee owner and the royalty owner there is an implied covenant in the deed that the mineral fee owner will use the utmost fair dealing and diligence in obtaining lease agreements in order to protect the royalty owner's interest." 144 Ct.Cl. at 177, 168 F.Supp. at 791.

The court holds that this line of decisions is inapposite here. The common denominator in all of them is a specific conveyance of a particular parcel of land with a retained royalty interest, or a lease of mineral rights in a specific parcel. In *Federal Land Bank,* for example, the court makes it clear that the Federal Government's duty arose under the specific circumstances unique to the parcel in question. 144 Ct.Cl. at 178, 168 F.Supp. at 791–92. Otherwise there would have been no factual context in which to assess the obligations of the land owner. No comparable duty could arise in the present case because there is no specific parcel of land involved.

The difficulty with Alaska's argument becomes manifest in its response to the Federal Government's statute of limitations defense. The State attempts to avoid the twin risks of, on the one hand, a duty that is so ephemeral it cannot be articulated, and, on the other hand, one as to which the limitations period has run. It has not succeeded. Alaska suggests that no duty arose until after Congress was confronted with the Department of Interior's ANWR report in 1987. The State's position is summed up in the affidavit of Mr. Eason in which he concludes, after summarizing the history of oil and gas exploration, leasing and production in Alaska, that "[w]hile there can be legitimate debate about the precise timing for when North Slope lands prospective for commercial oil and gas should be leased, there is no question in my mind that the time has arrived as regards the federal lands in ANWR, Yukon–Charley and Yukon Flats." Eason Aff. ¶ 22. The court has no reason to doubt the wisdom of Mr. Eason's assessment. Federal inaction is no doubt a source of enormous frustration to persons interested in seeing further production on the North Slope. Nevertheless, liability under the Tucker Act requires more than a contested claim that the executive or legislative branches have exercised poor judgment in managing a federal resource. In an effort to avoid a stale claim, the State is forced to defend a claim that has no parameters or pedigree.

As of 1991, the Federal Government still retained 248,021,000 acres of land in Alaska. Determining which lands to open up for leasing is a matter of judgment, considering a number of factors. Deciding the wisdom of leasing any particular parcel within those 248 million acres would inherently involve the court in weighing amorphous and circumstantial factors. The Federal Government's obligations would fluctuate from time to time depending on a confluence of politics, commerce, science, and serendipity. There are simply no judicially manageable standards to apply to such a decision-making process. Assuming such a continuing duty could ever arise, it could only be in the context of a fiduciary relationship. The State has not contended that such a relationship exists between itself and the Federal Government, and, in any event, it does not.

▪ As defendant correctly points out, section 28(b) must be read against the background of two hundred years of law recognizing in the Federal Government a virtually unfettered discretion as to the management of its own lands. U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...."); *Beecher v. Wetherby,* 95 U.S. 517, 24 L.Ed. 440 (1877) ("The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the government."); *Gibson v. Chouteau,* 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1871) ("With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations."). It would fly in the face of that body of law to imply into section 28(b) an

affirmative duty to develop the federal mineral lands in Alaska, particularly when, as discussed above, there would be no judicially manageable standards for determining whether the obligation was breached.[37]

The court concludes that the undisputed facts demonstrate as a matter of law that the United States made no promise to make federal mineral lands productive of royalty revenues for the State. Accordingly, summary judgment in favor of defendant on counts I through IV of plaintiff's complaint is appropriate.[38]

### The United States' Affirmative Defenses

■■■■ The Federal Government in its motion also raises the issue of whether counts I through IV of Alaska's complaint are timely. A contract or taking claim must be filed within six years of accrual. 28 U.S.C. § 2501. The present action was filed on July 22, 1993, more than six years, the Government contends, after events which would have put the State on notice of its current claims. The Government has also raised the "sovereign act" and "unmistakability doctrines" as defenses to the State's claim.[39] Because the court concludes that there was no promise to pay Alaska 90 percent of gross revenues in perpetuity and there was no implied duty to develop the mineral lands, these defenses are moot.[40]

### CONCLUSION

Based on the foregoing, Plaintiff's Motion for Partial Summary Judgment is denied. Defendant's Cross–Motion for Summary Judgment is granted. The Clerk is directed

---

**37.** The present case can be analogized to *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). In *Commonwealth Edison*, several taxpayers challenged a Montana severance tax on coal as being violative of the Commerce and Supremacy Clauses of the United States Constitution. The Supreme Court upheld the tax on the following basis:

[I]t is doubtful whether any legal test could adequately reflect the numerous and competing economic, geographic, demographic, social, and political considerations that must inform a decision about an acceptable rate or level of state taxation, and yet be reasonably capable of application in a wide variety of individual cases. But even apart from the difficulty of the judicial undertaking, the nature of the fact finding and judgment that would be required of the courts merely reinforces the conclusion that questions about the appropriate level of state taxes must be resolved through the political process.

*Id.* at 628, 101 S.Ct. at 2959. In the present case, the difficulty of the judicial undertaking to determine which Federal land in Alaska should or should not be leased would be enormous. As in *Commonwealth Edison*, the issue must be resolved through the political process.

**38.** Count IV, the taking claim, is also dismissed. Because there was no contractual or other right to insist that the Federal Government develop its mineral lands in Alaska, no property interest was taken.

**39.** The Sovereign Act Doctrine stands for the proposition that the "United States as a contractor cannot be held liable directly or indirectly for public acts of the United States as a sovereign." *Amino Bros. Co. v. United States*, 178 Ct.Cl. 515, 525, 372 F.2d 485, 491, *cert. denied*, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967) (citing *Horowitz v. United Sates*, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925)). Thus the focus is on whether the Federal Government acted in its contractual or sovereign capacity. *Id.* The reason for this is that Government contractors should not benefit more than private contractors when the Government passes a statute or takes other action affecting the public. Nash & Cibinic, ADMINISTRATION OF GOVERNMENT CONTRACTS 365 (1995).

The Unmistakability Doctrine states that courts should not interpret contracts in a way that "would immunize them from the sovereign power of the United States to change its laws...." *Trapper Mining Inc. v. Lujan*, 923 F.2d 774, 778 (10th Cir.) ("Congress is entitled to modify ... contracts through subsequent legislation unless the right is 'surrendered in unmistakable terms' ...") (citing *Bowen v. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52–53, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986)), *cert. denied*, 502 U.S. 821, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991); *Conoco Inc. v. United States*, 35 Fed. Cl. 309, 321 n. 7 (1996) ("The unmistakability doctrine ... says that the government contractually waives neither its sovereign immunity nor its sovereign power to legislate, regulate, or tax unless that power is surrendered in 'unmistakable terms.' ").

**40.** Because the untimeliness of a complaint affects the court's power to act, a statute of limitations defense is normally addressed before considering the merits of a claim. In this case, however, the State's assertion of what constitutes a breach of the alleged contract has varied during the litigation. The common assumption, however, is a contract with the alleged promises discussed above.

to enter judgment in favor of the defendant. No costs.